KRELLER GROUP, INC., Appellee,

v.

WFS FINANCIAL, INC., Appellant.

[Cite as *Kreller Group, Inc. v. WFS Fin., Inc.,* 155 Ohio App.3d 14, 2003-Ohio-5393.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–030236.

Decided Oct. 10, 2003.

16

18

William H. Blessing, for appellee.

Bricker & Eckler, L.L.P., Quintin F. Lindsmith and James P. Schuck, for appellant.

MARK P. PAINTER, Judge.

{¶ 1} Defendant-appellant, WFS Financial, Inc., appeals the trial court's denial of WFS's motions for directed verdict, judgment notwithstanding the verdict, and a new trial. WFS also claims that the trial court erred by admitting evidence that confused the issues and prejudiced the jury. The jury had found that WFS owed plaintiff-appellee, Kreller Group, Inc., $616,009.67 for consulting services. We affirm.

## I.  The High Cost of Credit Reports

{¶ 2} Kreller is a consulting company based in Cincinnati. Kreller advises its clients on how to reduce costs when purchasing credit reports. This process consists of researching a client company, examining how the company uses the credit reports, and explaining how to reduce costs. Kreller makes the initial contact with companies through telephone-sales consultants. Kreller makes a profit by engaging in benchmark agreements with its clients. These agreements identify the exact amount that a company pays for the information that it receives from credit bureaus. Kreller then receives 75 percent of the savings during the first year after the implementation of Kreller's recommendations. Kreller consults on both commercial-credit and consumer-credit reports. Consumer-credit

reports come from one of the three major credit bureaus—Equifax, Experian, and TransUnion.

{¶ 3} The credit bureaus collect information from their purchasers and the courts and other public records. They then compile this information and create a credit report that details the credit history of a given person or business. Gathering this information has become easier and less expensive with improvements in technology. Kreller recognizes the lower cost of credit reports and informs its clients accordingly.

{¶ 4} WFS is an automobile finance company. It buys loans from lenders around the country and currently services over $9 billion in loans. While processing loan applications, WFS purchases credit reports from the three major credit bureaus. This is a high-volume business, so WFS contracts with each of the three bureaus on price and volume. At all relevant times in this case, Thomas Wolfe was the president and chief executive officer of WFS. He had been with the company since 1998 and was promoted to his executive position in early 2000. Prior to coming to WFS, Wolfe had a great deal of experience in negotiating with the credit bureaus.

{¶ 5} In the spring of 2000, Kreller contacted WFS by telephone. Because the initial contact went well, Kreller sent Jason Amsler, a Kreller sales consultant, to WFS's headquarters to explain Kreller's services. Amsler met with Dennis Morris, WFS's chief credit officer, who was responsible for negotiating with the credit bureaus. Morris was intrigued by Amsler's ideas, so he later faxed a number of WFS invoices from the credit bureaus to Kreller's offices. Harvey Rosen, director of Kreller's consumer-credit division, analyzed the invoices and decided to pursue WFS as a client. After Rosen's analysis, both Amsler and Rosen had another meeting with Morris in June 2000 at WFS headquarters. At that meeting, the parties signed a "Letter of Intent," which provided the following:

{¶ 6} "1. Kreller will provide cost saving recommendations to customer on a contingency fee basis.

{¶ 7} "2. Customer is in no way obligated to use Kreller's recommendations.

{¶ 8} "3. Customer agrees to pay Kreller seventy-five percent of the savings realized in the first year after implementation of Kreller's recommendations. After the first year's savings, no fees are incurred.

{¶ 9} "* * *

{¶ 10} "5. Savings will be defined as any savings as a result of Kreller demonstrating a more cost efficient method of using or contracting for credit reporting services."

{¶ 11} On August 8, 2000, Rosen, Amsler, and Keith Benefield, another Kreller employee, arrived at WFS headquarters to begin the consultation. They met with WFS employees and analyzed a number of documents relating to the purchase of credit reports. After several days of gathering information, Kreller prepared a set of recommendations for WFS.

{¶ 12} Before presenting the recommendations, Rosen prepared three benchmark agreements. These agreements identified the exact amount that WFS was paying to each of the three credit bureaus for consumer credit reports. According to these agreements, WFS paid $1.04 per report to Experian, $1.18 to Equifax, and $1.28 to TransUnion. The agreements also indicated that WFS paid $489.02 in monthly communication-line charges to Experian and $910 in similar charges to Equifax. Rosen and Morris initialed these agreements on August 10, 2000.

## II. Savings Proposals

{¶ 13} Rosen then presented five pages of written recommendations to Morris. Kreller informed Morris that WFS was paying far too much to all three credit bureaus. Kreller suggested the elimination of unused data and redundant data, modified pricing, and credits for overcharges.

{¶ 14} In its first recommendation, Kreller suggested that WFS eliminate certain unused data. WFS received profile summaries from Experian but did not use this information. Further, WFS received the scores of a joint applicant from all three bureaus, but again did not use this data. Kreller estimated that the elimination of these costs could save WFS approximately $27,200 annually.

{¶ 15} Next, Kreller suggested that WFS eliminate redundant data. Kreller suggested that HAWK, SafeScan, and FACS were also included in the information in RiskWise. These were all fraud services, but WFS examined only the RiskWise data. According to the recommendations, elimination of the redundant data would amount to approximately $240,000 in yearly savings. TransUnion also charged WFS $.10 per report for year-of-issuance ("YOI") data that WFS did not use. Kreller estimated that elimination of this data would save WFS approximately $36,000 per year.

{¶ 16} Kreller further suggested that WFS was paying too much for the credit reports. Kreller recommended modified pricing of between $.70 and $.80 per report. These prices were partially based on a range that the credit bureaus had given to other customers operating on smaller volumes than WFS. Kreller estimated that the price reductions would save WFS approximately $367,000 per year.

{¶ 17} Kreller also suggested that both Equifax and TransUnion may have overcharged WFS in the recent past. Kreller recommended that WFS attempt to collect that money, which it claimed was no less than $92,000.

{¶ 18} After the initial presentation of the recommendations, Morris wanted Lee Whatcott, his superior and chief financial officer at WFS, to join them in the meeting. Morris was planning to leave WFS for another job and wanted Whatcott to get involved in the process. Whatcott joined the meeting, and Rosen repeated his recommendations.

{¶ 19} Following the presentation, Amsler presented the pair with three requests for proposals ("RFPs") addressed to each of the three credit bureaus. The RFPs informed the bureaus that WFS had hired Kreller to review its expenses. The letters requested that each bureau provide WFS with the best possible pricing for the services provided. The letter to TransUnion also recommended the elimination of charges for YOI data. All the letters originally had Whatcott's name under the signature line, but Whatcott insisted that Morris sign the letters. Before the meeting concluded, they redrafted the letters on WFS stationery to reflect the changes. Morris signed the letters, and Amsler promptly mailed them to the bureaus. Shortly thereafter, Morris left WFS.

### III. The Plot Thickens

{¶ 20} Soon after learning of Wolfe's new executive position at WFS, Mike Bloodworth called Wolfe to set up a meeting. Bloodworth was an old friend of Wolfe, who headed the automobile-credit division of Equifax. Bloodworth knew that the contract between WFS and Equifax had recently expired and decided to contact Wolfe about a renegotiation. Wolfe and Bloodworth eventually met in late August. During this meeting, Wolfe suggested that WFS was paying too much and that Equifax should eliminate the telecommunication charges.

{¶ 21} At some point during the renegotiation process, Bloodworth learned that James Little, Equifax's vice president for West Coast sales, had received the RFP from Morris. Bloodworth told Little that there was no need to respond to the RFP because Bloodworth was negotiating a new contract with WFS. In early September 2000, Rosen, Kreller's consumer-credit director, sent an email to Equifax asking when he could expect a response to the RFP. Little informed Rosen that Equifax was negotiating directly with Wolfe.

{¶ 22} Some time after their meeting, Bloodworth called Wolfe to ask him about pricing. Wolfe suggested $.70 for each credit report. Bloodworth agreed to this price on behalf of Equifax.

{¶ 23} Wolfe decided to hire his friend William Cole to negotiate a new Experian contract. Cole had previously worked at both Experian and Equifax. He had left Equifax in July 2000 and had started his own credit-report consulting

business. Cole signed a contract with WFS for his services in October 2000. The terms of the agreement stated that WFS would pay Cole a flat fee of $50,000 if he could negotiate a price of $.75 per report with Experian.

{¶ 24} Cole met with several Experian employees to negotiate the new contract. He began the negotiations by suggesting a price of $.65. Cole informed those at Experian that he knew that Experian charged a lower amount to certain customers. The negotiations continued for several weeks, but Cole could not get Experian down to $.75. He called Wolfe, who then "turned off" Experian in southern California as a negotiating tactic. Wolfe then obtained the credit reports for this area from the other credit bureaus. After this, Experian agreed to the $.75 price in December 2000. Cole received his $50,000.

{¶ 25} After these two agreements, Wolfe sent Ron Terry, WFS's new chief credit officer, to negotiate with TransUnion. Terry negotiated a new agreement with TransUnion by early 2001. Terry used the agreements with Experian and Equifax as leverage. TransUnion agreed to a price of $.70 per report.

{¶ 26} In summary, WFS reduced its spending on Experian consumer credit reports from $1.04 to $.75; on Equifax reports, from $1.18 to $.70; and on TransUnion reports, from $1.28 to $.70. None of the negotiations for the new prices took place prior to the Kreller recommendations. WFS saved $821,346.23 in the first year because of these price reductions.

{¶ 27} The jury concluded that WFS had used Kreller's proposals, and it used the first-year savings achieved by WFS to calculate its award to Kreller of $616,009.67, plus interest.

## IV. WFS Appeals

{¶ 28} WFS now raises four assignments of error, arguing that the trial court erred by (1) denying WFS's motion for a directed verdict and judgment notwithstanding the verdict because the jury verdict was against the manifest weight of the evidence, (2) denying WFS's motion for new trial, (3) admitting irrelevant evidence and allowing Kreller's counsel to mislead the jury, and (4) denying WFS's motion for a directed verdict and judgment notwithstanding the verdict because there was no enforceable contract between WFS and Kreller. We overrule all four assignments of error and affirm the judgment entered in Kreller's favor.

## V. Denial of WFS Motions

{¶ 29} WFS's first, second, and fourth assignments of error all relate to the weight and sufficiency of the evidence at trial. WFS's first and fourth assignments of error question the refusal to grant a directed verdict or judgment

notwithstanding the verdict. WFS's second assignment of error concerns the denial of its motion for a new trial.

{¶ 30} A motion for a new trial may be granted where the judgment is not sustained by the weight of the evidence.[1] In reviewing the trial court's denial of a motion for a new trial, we construe the evidence in a light favorable to the trial court's action rather than to the original jury's verdict.[2] We can reverse the trial court's decision only where the court's ruling was unreasonable, arbitrary, or unconscionable.[3] Further, "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the case."[4]

{¶ 31} We review the denial of the motions for a directed verdict and judgment notwithstanding the verdict de novo.[5] The trial court may direct a verdict or enter judgment notwithstanding the verdict where reasonable minds can come to only one conclusion.[6] In ruling on such motions, the court must construe the evidence in the light most favorable to the nonmoving party.[7] The motions test the legal sufficiency of evidence.[8] Where there is substantial competent evidence upon which reasonable minds may reach different conclusions, the court must deny the motions.[9]

## VI. Contract or Not

{¶ 32} We must first determine whether there was a contract between WFS and Kreller. WFS's fourth assignment of error maintains that the letter of intent was not a contract and that there was no duty to implement Kreller's recommendations or to pay Kreller for savings later realized. But there was a contract, and a corresponding obligation to pay Kreller for the savings.

---

1. Civ.R. 59.

2. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685.

3. Id.

4. Section 3(B)(3), Article IV, Ohio Constitution.

5. *Posin v. ABC Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 74 O.O.2d 427, 344 N.E.2d 334; *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 741 N.E.2d 155.

6. Civ.R. 50(A)(4).

7. *Posin,* supra.

8. *Cincinnati Gas & Elec. Co. v. Joseph Chevrolet Co.,* 153 Ohio App.3d 95, 2003-Ohio-1367, 791 N.E.2d 1016.

9. Id.

{¶ 33} California law controlled the contractual issue in this case. The parties do not dispute that they formed and executed the contract in California. California requires a subjective meeting of the minds on all material points for a valid contract formation.[10] In contrast, Ohio law requires only an objective meeting of the minds.[11]

{¶ 34} WFS does not dispute that Morris signed the letter of intent in his capacity as chief credit officer. It also admits that Morris initialed the benchmark agreements and that Morris and Whatcott received Kreller's recommendations.

{¶ 35} WFS claims that Morris and Kreller did not have a meeting of the minds on all the terms of the agreement. The evidence showed that Morris understood that WFS did not have to implement any of Kreller's recommendations. But if WFS did implement changes and reduce costs, Morris understood that WFS would owe Kreller 75 percent of the first-year savings. The letter of intent was clear as to the definition of "savings." Further, the benchmark agreements specifically set the levels from which savings would be calculated. Whether this amounted to a subjective meeting of the minds was a question for the jury. There is nothing in the record to indicate that the jury lost its way in finding that there was a meeting of the minds between Morris and Kreller.

{¶ 36} WFS also maintains that the letter of intent was an illusory contract. An illusory contract is unenforceable.[12] A party who states, "I promise to render a future performance, if I want to when the time arrives" has made no promise at all.[13]

{¶ 37} A promise in exchange for a promise is sufficient consideration to support a contract in California. In *Fosson v. Palace*, the agreement between a composer and a film producer stated, "If the Composition is used by the Company in the Picture * * *, Company shall pay Licensor [$1250] * * *."[14] The Ninth Circuit Court of Appeals analyzed California law and held that a valid contract had arisen "by virtue of the obligations the Producers agreed to assume in the event the Composition was used."[15]

---

10. *Banner Ent., Inc. v. Superior Court* (1998), 62 Cal.App.4th 348, 72 Cal.Rptr.2d 598.

11. See *Nilavar v. Osborn* (1998), 127 Ohio App.3d 1, 711 N.E.2d 726.

12. *Asmus v. Pacific Bell* (2000), 23 Cal.4th 1, 96 Cal.Rptr.2d 179, 999 P.2d 71.

13. Id.

14. *Fosson v. Palace* (C.A.9, 1996), 78 F.3d 1448.

15. Id. at 1454.

{¶ 38} WFS promised to keep all of Kreller's recommendations confidential. WFS also promised to compensate Kreller if WFS implemented Kreller's recommendations. Kreller promised to consult WFS regarding consumer-credit-report costs for a contingency fee. These were promises made in exchange for one another. They were analogous to the agreement reached in *Fosson,* where one party had the *option* to use another party's services. If WFS used Kreller's recommendations, then WFS had a duty to compensate Kreller, just as the film producer in *Fosson* had a duty to pay the composer if the music was used in the film. Once Kreller gave WFS its recommendations, the letter of intent and the benchmark agreements created a duty in WFS to keep those recommendations confidential and to pay Kreller if WFS implemented them. The contract was not illusory.

{¶ 39} The trial court was correct in refusing to grant a directed verdict or judgment notwithstanding the verdict. We therefore overrule WFS's fourth assignment of error.

## VII. Evidence Supporting the Verdict

{¶ 40} WFS's primary argument at trial was that it was merely a coincidence that WFS had successfully lowered its consumer-credit-report costs immediately following Kreller's recommendations. WFS asserted that it never implemented Kreller's recommendations. If WFS never implemented Kreller's recommendations, then WFS had no duty to compensate Kreller. From this, WFS concluded that the trial court should have directed a verdict in WFS's favor or granted its motion for a new trial.

{¶ 41} WFS did not dispute that Kreller had given WFS recommendations for lowering its consumer-credit-report costs. Both parties signed the letter of intent and the benchmark agreements. We have already ruled that there was a valid agreement between WFS and Kreller. If WFS implemented any of Kreller's recommendations, WFS had a duty to pay Kreller.

{¶ 42} Kreller prepared and sent letters signed by Morris to the credit bureaus in which WFS solicited lower price proposals. This put the credit bureaus on notice that WFS had knowledge that it might not have had prior to the consultation with Kreller. Reasonable minds could conclude that this constituted the beginning of implementation.

{¶ 43} Kreller recommended modified pricing. Specifically, Kreller suggested focusing on price-per-inquiry. WFS had been paying between $1.04 and $1.28 per report in its previous contracts. Kreller informed WFS that WFS should have been paying $.80 or below. James Little testified that he informed Morris that WFS's volume warranted a lower price with the bureaus. After Kreller's recommendations, WFS negotiated prices of $.70 and $.75. Cole testified that

Wolfe was the one who came up with the $.75 figure. WFS argues that this was merely the result of a series of coincidences, including Wolfe's taking over the presidency of WFS, Cole's starting his own consulting business, and the series of friendships between the negotiators. But Wolfe had been president and CEO since early 2000. The negotiations with the bureaus did not take place until August, immediately following Kreller's recommendations. And the prices WFS achieved were similar to Kreller's recommended prices. This evidence supported Kreller's case. The jury evidently did not believe WFS's "coincidence" theory, and we have no reason to doubt the jury's evaluation.

{¶ 44} WFS also argues that it was common knowledge in the industry that consumer-credit-report prices were dropping. But WFS was paying hundreds of thousands of dollars more than market price. Upon hearing an initial proposal from Kreller, Morris was "intrigued" at the prospect of lowering costs. Morris was surprised at what WFS was paying and laughed when Kreller revealed a more reasonable price. Reasonable minds could have concluded that WFS was not aware that it was overpaying for consumer reports.

{¶ 45} Further, WFS successfully eliminated its YOI charges from TransUnion. Prior to Kreller's involvement, WFS had paid $.10 per report for the YOI data. Kreller suggested eliminating this cost both in its recommendations to WFS and in the RFP to TransUnion. After renegotiation with TransUnion, WFS did not pay any fee for the YOI data.

{¶ 46} Similarly, there were some credit reports on which WFS was not paying the $.10 charge for HAWK. Kreller specifically recommended that WFS eliminate the cost of the HAWK data. After the renegotiation, some of TransUnion's invoices showed that WFS paid nothing for HAWK on a number of credit reports.

{¶ 47} Kreller also recommended the elimination of telecommunication charges from Equifax and Experian. Though it was unsuccessful, WFS attempted to eliminate these charges. In discussing the negotiations with Equifax, Cole stated that he knew Wolfe wanted to eliminate the line charges. Cole brought this up in his negotiations with Experian but was unsuccessful. While WFS still paid the charges after the negotiations, Wolfe's attempt to eliminate the charges was evidence of an attempted implementation of Kreller's recommendations. WFS claimed that Wolfe did not know about these recommendations—but this testimony supported Kreller's case.

{¶ 48} WFS stresses that its own personnel negotiated the new contracts and that they used their own tactics. But Kreller did not need to actually negotiate the new prices or to guide WFS every step of the way. The terms of their agreement called for Kreller to make recommendations and for WFS to pay

Kreller if those recommendations resulted in savings for WFS. WFS's argument is meritless.

{¶ 49} WFS also points out that it did not implement some of Kreller's specific recommendations. Despite Kreller's recommendations to the contrary, WFS continued to purchase data such as SafeScan and FACS. WFS never discussed the possible overcharges by Equifax and TransUnion. WFS also argues that it already knew it could leverage its volume in exchange for lower prices. The idea of "roll-up" or leveraging the other two bureaus' prices against the third may also have been common knowledge. But WFS need not have implemented all of Kreller's recommendations. The benchmark agreements stated that *any* changes that affected the average prices after implementing the recommendations were to be considered savings.

{¶ 50} Because there was substantial evidence upon which reasonable minds could differ, a directed verdict or judgment notwithstanding the verdict would have been inappropriate. We therefore overrule WFS's first assignment of error.

{¶ 51} Similarly, we cannot say that the trial court's decision to deny the motion for a new trial was unreasonable, arbitrary, or unconscionable. There was no abuse of discretion by the trial court. We therefore overrule WFS's second assignment of error.

## VIII. Prejudice and the Jury

{¶ 52} WFS's third assignment of error asserts that the trial court erred by admitting irrelevant evidence and permitting Kreller's counsel to confuse the issues. It contends that this unduly prejudiced the jury.

{¶ 53} Remarks calculated to arouse passion or prejudice in the jury may constitute prejudicial error.[16] The determination of whether counsel's misconduct is sufficient to taint the verdict with prejudice ordinarily lies in the discretion of the trial court.[17] Before an appellate court will reverse the exercise of discretion, the record must "clearly demonstrate highly improper argument by counsel which tends to inflame the jury."[18] The trial court was in the best position to determine whether there was any impropriety in this case. We defer to its judgment that there was not.

{¶ 54} During his cross-examination of Wolfe, Kreller's counsel confronted Wolfe on the issue of subprime lending. Wolfe had testified on direct

---

16. *Mahan v. Bethesda Hosp., Inc.* (1992), 84 Ohio App.3d 520, 617 N.E.2d 714.

17. Id., citing *Lance v. Leohr* (1983), 9 Ohio App.3d 297, 9 OBR 544, 459 N.E.2d 1315.

18. Id. at 527, 617 N.E.2d 714.

examination that WFS was not a subprime lender. But Kreller knew that WFS did make subprime loans. To demonstrate this to the jury, Kreller's counsel asked Wolfe whether WFS had ever made subprime loans. Wolfe admitted that it had. Kreller's counsel further illustrated his point with a number of WFS promissory notes that had been filed in the Hamilton County Court of Common Pleas. WFS had filed these notes in separate cases to recover on subprime loans with rates ranging from 18.99 to 24 percent. A copy of one of the notes was admitted as an exhibit. Kreller's counsel asked Wolfe whether he was aware that WFS did have subprime loans and whether it had filed the papers in court to try to collect on them. Wolfe had no knowledge of these notes, but he had already admitted that WFS had made loans in the specified ranges.

{¶ 55} WFS argues that this line of questioning improperly prejudiced the jury. A party may cross-examine a witness on all relevant matters and all matters affecting the credibility of the witness.[19] In describing WFS, Wolfe had testified that it was not a subprime lender. Kreller's counsel was merely demonstrating that Wolfe had mischaracterized WFS as a company. While this did not relate to the merits of the case, it did show that Wolfe's testimony had been compromised. "[T]he admissibility of evidence collateral to the issue being tried and pertinent only with respect to the credibility of the witness' [sic] testimony to be a matter ordinarily within the discretion of the trial court."[20] We see no abuse of discretion here.

{¶ 56} The promissory notes that Kreller's counsel displayed upon cross-examination present a similar issue. One of the promissory notes was admitted into evidence. As we have already discussed, these promissory notes and the entire line of questioning were merely an attempt to impeach the witness on cross-examination. While the notes did border on impeachment on a collateral issue, reversal would require us to find a prejudicial abuse of discretion. We see neither.

{¶ 57} WFS also asserts that Kreller's counsel "belabored" the issue of imputation of knowledge and confused the jury. WFS claims that this portion of cross-examination was improper because the point was not in issue. Neither party disputes that an officer's knowledge is imputed to the corporation. But WFS now argues that Kreller's questions about this issue confused and preju-diced the jury.

---

19. Evid.R. 611(B).

20. *Schwartz v. Wells* (1982), 5 Ohio App.3d 1, 3, 5 OBR 1, 449 N.E.2d 9.

{¶ 58} A corporation's officer's knowledge is imputed to the corporation.[21] A corporation can act only through its officers and agents.[22] Once Kreller gave its recommendations to Morris and Whatcott, WFS was charged with knowledge of the recommendations. Any implementation of those recommendations by WFS or its officers thus satisfied the implementation requirements of the contract with Kreller. Kreller's counsel's questions about the imputed knowledge were proper and could not have prejudiced or confused the jury.

{¶ 59} WFS also argues that Kreller's counsel slandered Wolfe during cross-examination and that this slander prejudiced the jury. WFS bases its argument on several statements and questions: (1) "Now, you live in a beautiful place. Coto Caza, San Miguel."; (2) "Mr. Wolfe, while you're out there on those California golf courses teeing up, did you ever think, you know, this may be a million bucks a year we're wasting right here * * *"; (3) the accusation that Wolfe had lied to the bureaus by falsely promising higher volumes; and (4) the inquiry into whether Wolfe taught his children to tell the truth. WFS also includes the subprime-lender issue among the "slanderous" statements, but we have already addressed this issue.

{¶ 60} With regard to the first statement, Kreller's counsel was merely trying to set up an analogy for Wolfe regarding the contract in question and real-estate contracts. Because Wolfe was unfamiliar with real-estate transactions, the line of questioning never went anywhere. This was not a prejudicial statement, let alone slander.

{¶ 61} WFS's counsel objected to the second statement. The court sustained the objection. Cole and Wolfe had golfed together in the past, and Kreller's counsel was merely inquiring whether Cole and Wolfe had discussed WFS and consumer-credit reports on the golf course. Kreller's counsel rephrased the question and went on to a series of questions intended to show Wolfe's ignorance of current credit-report pricing and to question Wolfe's credibility. These were proper inquiries on cross-examination, not prejudicial statements.

{¶ 62} The third and fourth statements were also proper attempts to impeach Wolfe on cross-examination. There was evidence that suggested that Wolfe had not been completely honest in his dealings with the bureaus and with Bloodworth. Kreller's counsel exposed these inconsistencies. While the question concerning Wolfe's children may have appeared inappropriate, it was a means of

21. *Arcanum Natl. Bank v. Hessler* (1982), 69 Ohio St.2d 549, 23 O.O.3d 468, 433 N.E.2d 204.

22. Id.

leading into a series of questions about Wolfe's credibility. Neither of these statements was prejudicial.

{¶ 63} We therefore overrule WFS's third assignment of error. Accordingly, we affirm the trial court's judgment.

Judgment affirmed.

DOAN, P.J., and GORMAN, J., concur.