HUDSON et al., Appellants,

v.

ARIAS et al., Appellees.*

[Cite as *Hudson v. Arias* (1995), 106 Ohio App.3d 724.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68117.

Decided Oct. 10, 1995.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1996), 75 Ohio St.3d 1412, 661 N.E.2d 760.

*Spangenberg, Shibley, Traci, Lancione & Liber* and *Dennis R. Lansdowne,* for appellants.

*Reminger & Reminger* and *George S. Coakley,* for appellees.

---

DYKE, Judge.

Plaintiffs-appellants, Kathleen Hudson and her husband Robert, appeal a verdict granted in favor of defendant-appellee, Jose Arias, M.D., a board certified obstetrician-gynecologist, in their medical malpractice action which asserted that appellee had failed to act appropriately to diagnose an alleged precancerous lesion of appellant's[1] colon when she sought his services for a hysterectomy.

Appellants claimed that appellee's failure to repeat a preoperative barium enema x-ray wherein the presence of stool may have prevented the visualization of a possible benign, precancerous or cancerous polyp resulted in a delayed diagnosis of colon cancer.

In their first assignment of error, appellants argue that appellee's medical expert was unqualified to testify because the only applicable standard of care in this case is that of a gynecologist and appellee's expert, a gastroenterologist, stated that he did not know what the standard of care was for a gynecologist reviewing the results of an allegedly ambiguous[2] barium enema study. In their

---

1. For purposes of clarity, "appellant" refers to Kathleen Hudson.

2. Appellants' expert opined that the x-ray was ambiguous because the presence of stool in the transverse colon made it impossible to exclude the possible presence of a polyp which could have been benign, precancerous or cancerous. Appellee and his expert contended that the x-ray was not ambiguous because appellee ordered the x-ray for the preoperative purpose of

second assignment of error, appellants claim that the trial court erred in instructing the jury that there was a dispute as to whether the appellee was acting as a gynecologist or a primary care physician/internist when he reviewed the results of the above-cited study.

Upon review we find appellants' assignments of error to be well taken. Accordingly, the judgment of the trial court is reversed and this cause is remanded.

Appellant presented to the appellee for the first time on June 9, 1988 with complaints of heavy vaginal bleeding. Appellee recommended a dilation and curettage and performed the procedure on July 7, 1988. Appellant did not contact appellee again until her annual appointment in June 1989. Appellant indicated during this visit that she continued to have vaginal bleeding. Appellee recommended a total abdominal hysterectomy; however, appellant indicated to the appellee that she wished to postpone the hysterectomy until her symptoms became unmanageable. One year later, to wit, on June 18, 1990, appellant called appellee's office to schedule surgery which would take place on July 12, 1990. On July 10, 1990, appellee saw the appellant in his office for the purpose of evaluating and preparing her for surgery. He stated that he performed a vaginal and rectal examination, that he tested appellant's stool for blood utilizing a guaiac test,[3] that appellant's stool tested negative for blood, and that he reviewed certain preoperative tests including a chest x-ray, IVP (intravenous pyelogram) and barium enema but did not discuss the results of these tests with the appellant because the results fell within the normal range. The results of the barium enema study were stated by the radiologist as follows:

"BARIUM ENEMA 7–2–90

"There is a large amount of stool in the colon with several large chunks of stool particularly in the transverse colon making it impossible to exclude an underlying polypoid lesion. There is free flow of barium through the colon with reflux into the small bowel.

"IMPRESSION:

"Grossly normal barium enema but with a large amount of stool present particularly in the transverse colon.

---

confirming appellant's pelvic organ placement prior to performing her total abdominal hysterectomy, which it did. Appellee and his expert contended that the x-ray was also not ambiguous because appellant did not seek appellee's services to rule out cancer and because she had no signs, symptoms, complaints, or high risk factors indicative of colon cancer.

3. Appellant stated that she did not recall whether the appellee performed a rectal examination and guaiac test.

"Spencer H. Anderson, M.D."

Appellee ordered the barium enema to confirm the size, location, and relationship of appellant's lower abdominal organs. He explained that appellant's enlarged uterus could displace these organs and that x-ray confirmation of their location would assist in reducing surgical complications. He further stated that he did not repeat the barium enema study because appellant presented no gastroenterological complaints, demonstrated no personal or family history of colon cancer, and demonstrated no clinical symptoms of intestinal cancer to warrant repetition.[4] On July 12, 1990 appellee performed the hysterectomy and appellant made a full recovery. Appellant did not contact the appellee again until September 1991. Appellant stated that she made the appointment with appellee at that time so he could review her hormone replacement therapy. She further stated that her only complaints at this time were vaginal itching and night sweats. Appellee performed a vaginal and rectal exam. However, the routine guaiac test he performed indicated the microscopic presence of blood in appellant's stool. In response to that finding, appellee ordered a barium enema and a liver and spleen scan and referred the appellant to a gastroenterologist. In October 1991, appellant was diagnosed as having a malignant polypoid lesion of the left transverse colon, which was removed on October 17, 1991 without evidence of metastasis. On February 18, 1993 appellant filed the instant action, which proceeded to trial on October 3, 1994.

Dr. Michael Baggish, Department Chairman of Obstetrics and Gynecology at Good Samaritan Hospital, Cincinnati, former Chairman of the Department of Obstetrics and Gynecology ("OBGYN") at Syracuse University Medical School and an OBGYN journal editor, referring to the fact that the presence of stool in the x-ray made it "impossible to exclude an underlying polypoid lesion," testified that a reasonably prudent gynecologist would have repeated the test and that the appellee fell below the standard of care in failing to do so. Dr. Baggish opined that the appellee was also negligent because he failed to inform the appellant of the results of this allegedly ambiguous test so she could determine whether to have it repeated.[5]

Dr. David Ransohoff, a nationally recognized, practicing gastroenterologist, Codirector of the Robert Johnson Clinical Scholars Program at the University of

---

4. A history and physical conducted by the anesthesiologist one day prior to surgery indicated that appellant had "no gastrointestinal symptoms," that she had no family history of colon cancer, that her liver and spleen were not palpable, and that there were no masses or tenderness in her abdomen.

5. Both experts testified via videotaped depositions. Appellants' filed a motion in limine with respect to Dr. Ransohoff's deposition, which was overruled by the court prior to and during trial.

North Carolina Medical School, and former advisor to the National Cancer Institute for the development of colon cancer screening policies, testified that under the circumstances the standard of care did not require the appellee to repeat the barium enema performed on July 2, 1990. Ransohoff testified that he disagreed with Dr. Baggish's opinion that the allegedly ambiguous test should have been repeated, because appellant presented with no gastrointestinal symptoms, because she was under fifty years of age, because she demonstrated no high risk factors for colon cancer in either her personal or family history, because her stool tested negative for blood at that time, and because the enema had been ordered to confirm organ placement and not to rule out cancer.[6] Dr. Ransohoff admitted that he did not know what the standard of care was for a gynecologist but testified that in interpreting the results of a barium enema study, the appellee was essentially functioning as a primary care physician and that appellee "acted within a standard of care for a—an internist or primary care doctor." A majority of the jury (six jurors out of eight) rendered a general verdict in favor of the appellee and special verdict in favor of the appellee on the issue of negligence. This appeal followed.

I

"The trial court erred by permitting defendant's expert witness in a medical malpractice case to testify when that witness did not know the standard of care applicable to the case."

 In their first assignment of error, appellants claim that pursuant to *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 10 O.O.3d 332, 383 N.E.2d 564, and *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, appellee's expert failed to demonstrate sufficient knowledge of appellee's specialty to qualify him as an expert in this case. We agree.

Having held that a podiatrist was competent to testify, that is, knowledgeable of and familiar with the principles involved in determining when to remove a tight leg cast, the *Alexander* court went on to consider whether the podiatrist was qualified to testify to the standard of care applicable to the defendant, an orthopedic surgeon. The court stated:

"What thus remains is to focus upon Dr. Cohen's qualifications as an expert witness. Any question pertaining to Dr. Cohen's knowledge and familiarity as a

---

**6.** Dr. Ransohoff stated that "[g]iven that there was no special reason at all to worry about cancer in this patient and that he had done the test for a wholly different reason, and given that barium enemas are commonly interpreted—show stool and can't completely rule out a cancer, I think it was reasonable for * * * Dr. Arias to say, I learned what I needed to learn about the pelvic organs, and given this person's very low risk, that I don't need to do further workup here."

podiatrist with casts previously has been resolved by our prior notation of his testimony concerning his formal training and his actual clinical experiences in the application of casts and their ancillary care. This court must now determine whether plaintiff's expert was qualified to testify concerning the standard of care that should be exercised by an orthopedic surgeon with respect to the application and removal of casts which are too tight. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127 [75 O.O.2d 184, 346 N.E.2d 673]. Ohio case law reveals the adoption of the generally accepted rule that *the witness must demonstrate a knowledge of the standards of the school and specialty, if any, of the defendant physician which is sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and or specialty if it differs from that of the defendant.* See *Willett v. Rowekamp* (1938), 134 Ohio St. 285 [12 O.O. 91, 16 N.E.2d 457]; *Bruni v. Tatsumi, supra.* Thus it is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." (Emphasis added.) *Id.* at 159–160, 10 O.O.3d at 334–335, 383 N.E.2d at 567.

In *Alexander*, it was clear that the podiatrist did not know the standard of care to be attributed to an orthopedic surgeon. See *Alexander, id.* at 163, 10 O.O.3d at 336–337, 383 N.E.2d at 568–569 (Leach, J., dissenting).[7] However, the podiatrist did affirmatively testify that "there was a common way all surgeons applied casts and that the principles used in applying the plaintiff's cast were the same as he had been taught." *Id.* at 160, 10 O.O.3d at 335, 383 N.E.2d at 567. The *Alexander* court then noted: "The record, therefore, contains probative evidence that there exists a minimum standard of care common to all specialties with regard to the application of casts." *Id.* at 160, 10 O.O.3d at 335, 383 N.E.2d at 567.

In the instant case, while Dr. Ransohoff was extremely knowledgeable (because of his expertise in developing colon cancer screening protocols) about the standard of care applicable to gastroenterologists, primary care physicians, and internists involved in determining when an ambiguous barium enema study should be repeated, he was unable to demonstrate his knowledge as to the standard of care applicable to appellee's specialty. While this lack of knowledge

---

7. Dissenting Justice Leach wrote:

"When the testimony (including the proffer) of Dr. Cohen is carefully examined, it clearly appears that *he did not even attempt to profess expertise involving the orthopedic question of when an ankle and leg cast,* placed to immobilize the area to accomplish the knitting of bones following an open reduction and internal fixation by the use of screws and wires, *could or should be removed. Nor did Dr. Cohen actually assert any knowledge of the key question as to the standard of care involved in such a medical decision; nor the deviation by any of the defendants from such standard.*" (Emphasis added.)

would not necessarily disqualify his testimony, Dr. Ransohoff, unlike the podiatrist in *Alexander*, failed to make any statements which would establish the existence of a "minimum standard of care common to all specialties" regarding the decision to repeat an ambiguous barium enema study. Our review of the record demonstrates that Dr. Ransohoff's statements regarding the applicable standard of care refer to his own school and specialty and not to appellee's school and specialty or to all surgical specialties. Consequently, while Dr. Ransohoff, as a gastroenterologist, was competent to testify under *Alexander*, he ultimately disqualified himself when he admitted that he had no knowledge as to what gynecologists do or should do when faced with an allegedly ambiguous barium enema study.

Since Dr. Ransohoff had no knowledge of the standard of care, that is, the conduct required of gynecologists in this situation, it follows that he could only speculate as to a deviation from or a compliance with the standard. Therein lies the prejudice to the appellants. While we are not unmindful that an anesthesiologist who stated that he was "not familiar with everything an obstetrician does" and who also stated that he was familiar with the standard of care applicable to obstetricians in intensive care settings "to some extent" was held to be qualified to testify as an expert against an obstetrician, that anesthesiologist did testify that he had served as a former director of obstetric anesthesia and that he worked and consulted closely with obstetricians in intensive care units. See *Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840, 631 N.E.2d 642. Unlike the anesthesiologist in *Wells,* Dr. Ransohoff's credentials and experience failed to establish a prior or current professional relationship with the discipline of gynecology or with practicing gynecologists themselves. Accordingly, we cannot say that Dr. Ransohoff demonstrated sufficient knowledge of the standards of appellee's specialty pursuant to *Alexander* to qualify him to testify as an expert in appellee's behalf.

Appellants' first assignment of error is sustained.

## II

"The trial court erred in instructing the jury that there was a dispute as to the defendant physician's capacity when there was no evidence of any such dispute or issue."

Appellants contend that there was no evidence in the record to raise a disputed issue as to whether the appellee was acting as a gynecologist or a primary care physician/internist in analyzing the results of appellant's barium study. We agree.

A jury is entitled to receive from the court instructions in the general charge on all of the facts in controversy that are presented by the pleadings and the evidence. *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585. While Dr. Ransohoff asserted that appellee was behaving like a primary care physician or internist in determining whether to repeat a barium enema study, he did not affirmatively dispute appellant's and Dr. Arias's testimony which established a patient-gynecologist relationship. While other jurisdictions have held that experts' conflicting testimony as to the applicable standard of care constitutes a question of fact for the jury,[8] *Alexander* and *Bruni* hold that an expert may testify only to the defendant physician's school and specialty or to a "minimum standard of care common to all specialties" regarding the procedure at issue. Hence, the trial court erred in instructing the jury with respect appellee's dual capacities which implicate competing standards of care as opposed to a single standard of care.

Appellants' second assignment of error is sustained. Accordingly, the judgment of the trial court is reversed, and the cause is remanded.

*Judgment reversed*
*and cause remanded.*

PATTON, C.J., and CORRIGAN, J., concur.

JOHN V. CORRIGAN, J., retired, of the Eighth Appellate District, sitting by assignment.

---

8. See *Rock v. Pickleman* (1991), 214 Ill.App.3d 368, 158 Ill.Dec. 569, 574 N.E.2d 682, and *Wright v. Schulte* (Fla.App.1983), 441 So.2d 660.