[Cite as *Adams v. Durrani*, 2022-Ohio-60.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| PATRICIA ADAMS, | : | APPEAL NO. C-200173 |
| and | : | TRIAL NO. A-1506958 |
| LARRY ADAMS, | : | |
| Plaintiffs-Appellees, | : | *O P I N I O N.* |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | |
| Defendants-Appellants. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  January 12, 2022

*Robert A. Winter, Jr., The Deters Law Firm Co. II, P.A., James F. Maus* and *Alex Petraglia,* for Plaintiffs-Appellees,

*Taft Stettinius & Hollister, L.L.P., Russel S. Sayre, Aaron M. Herzig, Philip D. Williamson* and *Anna M. Greve*, for Defendants-Appellants.

**CROUSE, Judge.**

{¶1} Defendants-appellants Abubakar Atiq Durrani, M.D., and the Center for Advanced Spine Technologies, Inc., ("CAST") appeal the trial court's judgment awarding plaintiffs-appellees Patricia and Larry Adams damages in the amount of $745,217.14 on their claims for negligence, lack of informed consent, fraudulent misrepresentation, and battery. For the reasons that follow, we affirm the trial court's judgment.

### *Factual and Procedural Background*

{¶2} Patricia Adams is a former patient of Durrani. Adams testified that she has long suffered headaches and pain in her neck and back. In 2007, after an incident at work, her pain became worse. She underwent surgery by Dr. David Weinsweig to fuse her C5-C6 and C6-C7 vertebrae in her cervical spine. The surgery provided temporary relief, but by 2010 the pain had returned and was of such severity that she was treating with a pain specialist and seeing a psychiatrist about depression.

{¶3} Adams testified that she went to see Durrani for the first time in July 2010 to inquire about being prescribed "nerve blocks" to help her manage the pain. Durrani completed a physical exam and ordered that several diagnostic images of Adams's spine be taken. On July 30, 2010, x-rays and a magnetic resonance imaging ("MRI") exam were taken of Adams's lumbar spine by a radiologist at a hospital near her home in West Virginia. An MRI of her cervical spine was taken as well.

{¶4} Adams attended another appointment with Durrani on August 10, 2010. Durrani reviewed the diagnostic images taken in July and summarized his

conclusions to Adams and in a letter he wrote to Adams's primary care physician, Dr. James Walker, on August 24, 2010. Durrani concluded that Adams had spondylolisthesis of the L3-L4 and L4-L5 vertebrae and neural foramina stenosis in her lumbar spine, with the left side being completely blocked and the right side 80 percent blocked. Durrani recommended surgery—"L3-4 interbody fusion with foraminotomy on the left side and a posterior spinal instrumentation and fusion." Durrani performed the surgery on November 12, 2010.

{¶5} Adams testified that her next appointment with Durrani occurred in January 2013. He completed a physical exam and reviewed diagnostic images taken between March 2011 and May 2012. Durrani summarized his conclusions in two letters written to Adams's primary care physician, Dr. Walker. In an April 19, 2012 letter, Durrani concluded that Adams was suffering from cervical spondylotic myelopathy and advanced cervical stenosis. In a January 24, 2013 letter, Durrani concluded that Adams had cervical arthrosis and a large cervical pannus at the C1-C2 vertebrae and cervical medullary syndrome. Durrani surmised that all of Adams's pain was coming from the C1-C2 vertebrae in the cervical spine.

{¶6} Adams testified that Durrani also told her that she had rotational instability in her cervical spine and could be put on a ventilator or die if the problem were not corrected. He recommended that she undergo surgery on her cervical spine—"C1-C2 posterior instrumented spinal fusion." Durrani performed the surgery on April 8, 2013.

{¶7} On April 1, 2014, the Adamses filed suit against appellants in the Butler County Court of Common Pleas, asserting various claims, including negligence, lack of informed consent, fraudulent misrepresentation, battery, and loss

of consortium. The Adamses dismissed the action on November 25, 2015. On December 22, 2015, they refiled their claims against appellants in the Hamilton County Court of Common Pleas and added two additional defendants, West Chester Hospital and UC Health. The Adamses reached a settlement agreement with West Chester Hospital and UC Health, and the case proceeded to trial against Durrani and CAST.

{¶8} Following six days of testimony, the jury found that "Mr. Durrani was negligent and breached the standard of care due to the fact that he performed a C1-C2 fusion surgery [the 2013 surgery] that was not medically indicated." The jury also returned a verdict in favor of the Adamses on their claims for lack of informed consent, fraudulent misrepresentation and battery. The jury found in favor of defendants-appellants on Larry Adams's claim for loss of consortium. The jury awarded the Adamses $116,533 for past medical expenses and $975,000 in noneconomic damages. Pursuant to R.C. 2323.43(A)(3), the trial court remitted the noneconomic damages to $500,000. It granted the Adamses' motion for prejudgment interest in the amount of $128,684.14 and entered a judgment of $745,217.14 against appellants.

{¶9} On appeal, appellants contend that: (1) the trial court erred in denying the motion for judgment notwithstanding the verdict, a new trial, or remittitur, and (2) any claims based on the November 2010 surgery are barred by R.C. 2305.113(C).

### The 2013 Surgery

{¶10} Adams's case primarily relied upon the testimony of three expert witnesses: Doctors Stephen Bloomfield, Keith Wilkey, and Rainjiv Saini. Because the

jury did not find negligence regarding the 2010 surgery, we focus on the evidence as it pertained to the 2013 surgery.

{¶11} Dr. Stephen Bloomfield is a neurosurgeon. He testified that he reviewed Durrani's justifications for the 2013 surgery, as summarized in his letters to Dr. Walker. Bloomfield testified that none of the diagnostic images revealed any indication of a large cervical pannus, cervical medullary syndrome, or rotatory instability. Regarding Durrani's findings of cervical spondylotic myelopathy and advanced cervical stenosis, Bloomfield testified, "[T]his is a brand new thing made up by Durrani's misrepresentation of the facts."

{¶12} Durrani did not mention any stenosis or rotatory instability with the C1-C2 vertebrae in his August 24, 2010 letter and did not recommend cervical spinal surgery in 2010. Bloomfield compared the images taken in 2011 and 2012 to those taken in 2010, and concluded that there had been no changes in the cervical spine. Therefore, Bloomfield claimed that there was no evidence to support Durrani's conclusions in his April 2012 and January 2013 letters that the cervical spine had degenerated to the point that surgery was required. Bloomfield testified that the 2013 surgery was not medically indicated. He testified that as a result of the surgery, Adams lost 90 percent of her ability to rotate her head left and right.

{¶13} Adams also played the video deposition of Dr. Keith Wilkey, an orthopedic surgeon. His testimony was largely consistent with Bloomfield's. He testified that Durrani lied in his representations to Adams and Dr. Walker, and that the 2013 surgery was not medically indicated.

{¶14} Dr. Rainjiv Saini testified as an expert in radiology and neuroradiology. He described radiology as using medical equipment to image

different parts of the body. Neuroradiology involves taking images of the brain and spinal cord in order to identify diseases of the head, neck, and face. Saini testified that he has trained orthopedic surgeons, neurologists, and neurosurgeons in what to look for and what not to look for in diagnostic images and how to diagnose diseases.

{¶15} Saini's testimony is largely consistent with Bloomfield's and Wilkey's. He compared images from an MRI taken in July 2010 to one taken in May 2012. He testified that the radiologist who initially read the MRI images at the hospital (the "reading radiologist") noted the prior surgical changes performed by Dr. Weinsweig at the C5-C6 and C7 vertebrae, but stated that the "other vertebral bodies are normal in alignment without any pathology" and did not mention any problems with the C1-C2 vertebrae. Saini agreed with the reading radiologist. He testified that the images showed minor degenerative changes, but "no significant asymmetry between the right arch of C1 and the left arch at C1 and the odontoid process."

{¶16} Saini testified that he also did not see "significant arthrosis at C1-C2." There was a "little bit of degenerative change," but "not that significant and no large pannus for bone at C1-2." He testified that the MRI exam in May 2012 "was pretty much unchanged" from the one taken in July 2010. He noted that Durrani did not seek cervical spinal surgery in 2010, and there was nothing in the more recent images to suggest that surgery was necessary. Saini also testified that Durrani's conclusion that there was instability in the C1-C2 vertebrae was not supported by the images.

{¶17} The defense presented the testimony of two expert witnesses. Dr. Myron Marx, a radiologist, testified that the diagnostic images supported Durrani's conclusions and that the surgeries were medically indicated. Likewise, Dr. Paul

Kaloostian, a neurosurgeon, testified that Durrani's conclusions were correct and the surgeries were medically indicated.

### *First Assignment of Error*

**{¶18}** In their first assignment of error, appellants argue the trial court erred in denying their motion for judgment notwithstanding the verdict, a new trial, or remittitur.

**{¶19}** Motions for judgment notwithstanding the verdict are governed by Civ.R. 50 and test the sufficiency of the evidence. *Kreller Group, Inc. v. WFS Fin., Inc.,* 155 Ohio App.3d 14, 2003-Ohio-5393, 798 N.E.2d 1179, ¶ 31 (1st Dist.). The court construes the evidence in the light most favorable to the nonmoving party, and will grant the motion only if reasonable minds could come to but one conclusion, and that conclusion is in favor of the moving party. *Id.* "Where there is substantial competent evidence upon which reasonable minds may reach different conclusions, the court must deny the motion." *Id.* An appellate court reviews the denial of a motion for judgment notwithstanding the verdict de novo. *Id.*

**{¶20}** Civ.R. 59 governs motions for new trials. A court may grant a motion for a new trial for, among other things, an irregularity in the proceedings of the court, if the judgment is not sustained by the weight of the evidence, or any reason "for good cause shown." Civ.R. 59(A). In reviewing a trial court's denial of a motion for a new trial, we "construe the evidence in a light favorable to the trial court's action rather than to the original jury's verdict." *Kreller* at ¶ 30. We apply an abuse-of-discretion standard of review and will reverse only where the ruling was unreasonable, arbitrary, or unconscionable. *Id.*

{¶21} "The crux of a medical-malpractice claim is whether the defendant-doctor's treatment fell below the appropriate standard of care." *Setters v. Durrani*, 2020-Ohio-6859, 164 N.E.3d 1159, ¶ 48 (1st Dist.).

{¶22} Adams alleged that Durrani's treatment fell below the standard of care because he performed two surgeries that were not medically indicated. She further alleged that he fraudulently misrepresented the necessity of the surgeries and failed to get her informed consent for the surgeries.

**First Issue for Review**

{¶23} Appellants first argue the trial court violated Evid.R. 403(A) and 404(B) by admitting evidence of Durrani's license revocations and other "irrelevant information."

{¶24} Evid.R. 403(A) prohibits the admission of evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 404(B) provides, in relevant part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶25} Appellants contend that three categories of evidence should not have been admitted: (1) references to the revocation of Durrani's medical license, (2) references to other lawsuits filed against Durrani, and (3) Dr. Wilkey's testimony regarding Durrani's character and absence from the trial.

### I. License Revocation

{¶26} The court ruled pretrial that evidence of Durrani's license revocation was inadmissible. Neither party mentioned the license revocation at trial, but appellants argue the jury was able to infer Durrani's license had been revoked because the trial court told the jury during voir dire:

> Mr. Durrani is no longer a physician in the State of Ohio. He was a
> physician licensed to practice medicine when this occurred, but he is not
> a physician. So I'm not going to refer to him as Dr. Durrani. I'm going to
> refer to him as Mr. Durrani because that's what he is right now.

The court and plaintiff's counsel proceeded to refer to Durrani as "Mr." throughout the trial.

{¶27} The court's assertion that Durrani was no longer a doctor because he was no longer licensed was incorrect. An individual becomes a medical doctor upon receipt of a medical doctorate from an accredited medical school. Kowarski, *How to Become a Doctor: A Step-by Step Guide,* U.S. News & World Report (Nov. 30, 2020) https://www.usnews.com/education/best-graduate-schools/top-medical-schools/articles/how-to-become-a-doctor-a-step-by-step-guide (accessed Dec. 30, 2021) ("Once someone has earned a medical degree and graduated from medical school, he or she is officially a doctor."). A doctor must then become licensed in the jurisdiction in which he or she practices medicine. *Id.* Therefore, the revocation of a medical license does not mean that the person may no longer use the title, "Dr."

{¶28} We recognize the potential prejudice in the trial judge's statements. The judge's statements invited the jury to infer that Durrani was no longer a doctor

either because of the surgeries he performed on Adams or because he was a bad doctor in general.

{¶29}  Nevertheless, the trial court informed the parties in its pretrial order that it would refer to Durrani as "Mr." and not "Dr." Despite the forewarning, appellants did not file a motion in limine on the issue or object to the court's statements during voir dire. Therefore, they have waived any error resulting from the statements. *See Furnier v. Drury*, 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082, ¶ 18 (1st Dist.).

## II. Other Lawsuits

{¶30}  Appellants argue that three times during trial references were made to other medical-malpractice lawsuits filed against Durrani. Appellants point to two statements made by the trial court, but neither statement was objected to. Therefore, appellants have waived any error related to those statements. *See Furnier* at ¶ 18. Appellants point to a third statement, this one by Adams's counsel during his cross-examination of Durrani's expert witness Dr. Paul Kaloostian, where counsel asked, "Are you aware of how often Dr. Durrani diagnosed – or Mr. Durrani diagnosed patients with...." His question was cut off because appellants' counsel objected and the objection was sustained. Therefore, there is no error.

{¶31}  Furthermore, once the statements are read in their proper context it is clear that they do not refer to other lawsuits filed against Durrani as appellants claim.

{¶32}  First, Durrani points to the following statement by the trial court: "We have a bunch of people because there's been some publicity on this case." Durrani seems to suggest that referring to "publicity" improperly implies that there are other

malpractice cases against Durrani. During voir dire, the trial court asked which potential jurors might have problems with sitting on a trial that would last two weeks. After listening to several potential jurors explain why they could not sit for a two-week trial, the court told a potential juror that he would not "mess up" her vacation and that he did not want her to sit on the jury if she would be worrying about whether she would make her vacation. The court stated:

> It's like childcare. You don't want to be worried about whether the babysitter is going to be there or not. I understand that. We have enough jurors. We're only going to have eight jurors and two alternates. So we're only going to have ten. We have a bunch of people because there's been some publicity on this case.

The court was clearly discussing the available pool of jurors and not other lawsuits filed against Durrani. In fact, the court specifically referred to "this case" and did not refer to any other cases filed against Durrani.

{¶33} Next, Durrani complains of a statement made by the court instructing the jury not to "Google" Durrani or medical-malpractice lawsuits. A potential juror had raised a concern over her name being part of the record because she was "on social media." The court stated:

> You can tell – nobody in this group would do this. You can tell somebody don't go Google, because I'm going to tell you you can't Google this case, you can't Google Ms. Adams, you can't Google Mr. Durrani, and you can't Google lawsuits or medical malpractice cases. You can't do that. You can't tell your friends, hey, I'm on a trial today. Because what you're going to get about this case is going to be in the four walls of this building, and you

11

are the fact finders. * * * I've tried 40 capital murder cases and jurors are always concerned about it, and I've never had a juror threatened, I've never had a juror harassed.

{¶34} The court instructed the jurors not to look for any outside information about Durrani, Adams, or lawsuits in general. It did not communicate to the jury that Durrani was the subject of multiple lawsuits.

### III. Dr. Wilkey's character remarks

{¶35} Appellants argue that under Evid.R. 403(A), four categories of Dr. Wilkey's testimony should have been excluded because the probative value was substantially outweighed by the risk of unfair prejudice.

1. Appellants claim that Wilkey testified 35 times that Durrani was a "liar" and a "fraud."

{¶36} Wilkey did repeatedly testify that Durrani lied and that his findings and conclusions about Adams's condition and the necessity of the surgeries were fraudulent. Appellants' counsel objected to some, but not all of the instances.

{¶37} Wilkey's testimony related to his medical opinion about Durrani's conclusions. For example, when asked about Durrani's conclusion that the neural foramina at the L3-L4 vertebrae were blocked, Wilkey testified, "These are lies. These are nonexistent. And the only reason that he does them is so that he can get insurance approval to do a surgery that is not necessary."

{¶38} It is clear from Wilkey's testimony that he disliked Durrani on a personal level, and nothing in this opinion should condone the ad hominem attacks in his testimony. Besides his testimony that Durrani lied, Wilkey also called Durrani a "charlatan" and "infamous." But his testimony that Durrani lied and acted

fraudulently related to Adams's claim that Durrani fraudulently misrepresented the nature of her condition and the necessity of surgery. Therefore, we find that there was no abuse of discretion in admitting Wilkey's testimony, particularly given the lack of consistent objections to these statements.

2. Wilkey testified, "[I]t would be nice to ask [Durrani] if he would show up for his trial."

**{¶39}** This statement was not objected to. Thus, any error was waived. *See Furnier,* 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082, at ¶ 18. Also, the jurors already knew that Durrani was not going to testify at trial. During voir dire, and without objection, the trial court instructed the potential jurors:

Dr. Durrani is out of the country. He has left the country. He is living in Pakistan, and he is not available for either the Plaintiff or the Defendant. We can't bring him back here and force him to sit in this seat. So he is over there and you're not going to hear him testify because neither the Plaintiff nor the Defendant can bring him into this courtroom.

3. Wilkey testified that Durrani was "not a doctor in this country anymore."

**{¶40}** Counsel's objection to this statement was sustained. Further, as stated above, the jury had already been told that Durrani was living in Pakistan. There was no error.

4. Wilkey testified, "Durrani was quite the charlatan."

**{¶41}** There was no objection to this statement. Therefore, any error was waived. *See Furnier* at ¶ 18.

13

## Second Issue for Review

**{¶42}** In their second issue for review, appellants contend Dr. Saini improperly testified about issues solely in the realm of surgeons. Appellants argue that Saini should not have been permitted to testify about whether the surgeries were necessary and whether Adams gave informed consent to the surgeries because his testimony did not satisfy Evid.R. 702.

**{¶43}** Evid.R. 702 provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way

that will yield an accurate result.

{¶44} "A trial court has discretion to determine whether a witness is competent to testify as an expert, and the trial court's decision will not be reversed absent an abuse of discretion." *Guiliani v. Shehata*, 2014-Ohio-4240, 19 N.E.3d 971, ¶ 42 (1st Dist.), quoting *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19.

{¶45} Appellants raise three arguments with regard to Saini's testimony: (1) he lacked sufficient facts and data on which to base his opinions, (2) he should not have been permitted to testify about whether the surgery was necessary and whether there was a lack of informed consent because he was not a surgeon, and (3) he should not have been permitted to offer a legal opinion that a patient cannot consent to surgery that is not indicated. Appellants contend that for these reasons, the admission of Saini's testimony was improper and a new trial should be ordered.

{¶46} However, the only objection raised by appellants to Saini's testimony was the following:

Your Honor, the basis of the objection is, [Saini] just testified that he's

not a surgeon and he doesn't recall as to whether or not the patient needs

surgery. Now he's getting into informed consent forms. It has nothing to

do with the imaging. It's so far out of his field, I don't think it's proper.

{¶47} Appellants did not object to the admission of Saini's testimony on the basis that he lacked sufficient facts and data upon which to base his opinion, nor did they object on the basis that he was offering a legal opinion. Appellants also did not raise these issues in their motion for judgment notwithstanding the verdict/new

trial. Thus, those issues have been waived. *See State v. Moreland*, 50 Ohio St.3d 58, 63, 552 N.E.2d 894 (1990) (holding that appellant's failure to object to the admission of expert witness testimony waived all but plain-error review of the issue on appeal); Evid.R. 103(A) (error may not be predicated on admission of evidence unless timely objection or motion to strike appears in the record stating the ground of the objection); *Willis v. Martin*, 4th Dist. Scioto No. 06CA3053, 2006-Ohio-4846, ¶ 25, 35 (failure to object to expert witness testimony waives all but plain error, and eliciting expert testimony on cross-examination is invited error).[1]

{¶48} Therefore, we decline to review appellants' arguments that Saini lacked sufficient facts and data upon which to base his opinions and that he offered a legal opinion on informed consent during his testimony.

{¶49} Appellants' objection can only be construed as an objection to Saini's ability to testify about the necessity of the surgeries and informed consent because he is a neuroradiologist and not a surgeon.

{¶50} In medical-malpractice cases, "a witness need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." *Guiliani* at ¶ 43, quoting *Alexander v. Mt. Carmel Med. Ctr.,* 56 Ohio St.2d 155, 160, 383 N.E.2d 564 (1978). "[A]n expert need only aid the trier of fact in the search for the truth and need not be the best witness on the subject." *Guiliani* at ¶ 43.

---

[1] We note that appellants did not make a plain-error argument and "we will not sua sponte undertake a plain-error analysis on [their] behalf." *Cable Busters, LLC v. Mosley*, 1st Dist. Hamilton No. C-190364, 2020-Ohio-3442, ¶ 8.

{¶51} The expert witness "must demonstrate a knowledge of the standards of the school and specialty, if any, of the defendant physician which is sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and, or, specialty if it differs from that of the defendant." *Alexander* at 160. In *Alexander,* the court held that the proposed expert witness, a podiatrist, was competent to testify that the cast applied by the defendant doctor, an orthopedic surgeon, was too tight. *Id.* at syllabus. Plaintiffs had shown there is a "minimum standard of care common to the application and removal of a cast, and * * * the podiatrist by his education and clinical experience ha[d] the requisite familiarity and knowledge concerning these procedures." *Id.* Where "fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant." *Id.* at 158.

{¶52} In *Ishler v. Miller*, 56 Ohio St.2d 447, 453, 384 N.E.2d 296 (1978), the Ohio Supreme Court held that the trial court did not err in permitting a physician specializing in the fields of neurology and psychiatry to testify that the defendant-doctor, an orthopedic surgeon, performed unnecessary surgery. The expert witness worked in close conjunction with orthopedic surgeons as an attending neurologist at a primarily orthopedic hospital, frequently served as a consultant to orthopedic surgeons attempting to diagnose low back problems, employed the same diagnostic tools as used by orthopedic surgeons in his work, and demonstrated a knowledge of the standards or procedures generally used by members of the defendant's profession in arriving at a decision to perform back surgery. *Id.* "Although Doctor Kaplan could not have qualified as an expert witness concerning whether Doctor

17

Miller properly performed surgery, it is clear that the practical experience gained from his consultations with orthopedic surgeons qualified him to testify regarding the suitability of Ishler for surgery." *Id.*

{¶53} Appellants acknowledge that it was proper for Saini to testify regarding what the diagnostic images showed, but argue Saini's testimony went beyond that when he testified that the surgeries were unnecessary and unjustified and that Adams could not have consented to the surgeries. They contend Saini lacked the "knowledge, skill, experience, training, or education" to give such testimony.

{¶54} In its judgment overruling appellants' motion for judgment notwithstanding the verdict/new trial, the trial court stated that Saini's testimony "was well within his expertise. Defense expert testimony [Dr. Marx] was that the radiology evidence called for surgery, Dr. Saini testified it was [sic] not."

{¶55} Meeting the minimum standard of care as a surgeon includes reviewing diagnostic images before determining whether surgery is necessary. On this point, a surgeon's duty overlaps with that of a radiologist. *See Alexander*, 56 Ohio St.2d at 158, 383 N.E.2d 564 (where "fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant"). In fact, both Saini and Marx testified that a radiologist is specially trained and qualified to review diagnostic images.

{¶56} Also, Saini worked closely with and trained orthopedic surgeons, used the same diagnostic technology as Durrani, and demonstrated knowledge of the standard used by surgeons in reviewing diagnostic images and arriving at a decision to perform surgery. *See Ishler,* 56 Ohio St.2d at 453, 384 N.E.2d 296; *compare*

*Nickler v. Mercy Med. Ctr.*, 5th Dist. Stark No. 2002CA00130, 2003-Ohio-231, ¶ 43-44 (finding that context in which the " 'principles of basic medicine' [such as history, diagnosis and examination] are applied is different in an urgent care setting than the context with a primary care physician who sees the patient on a regular basis," and that the field of urgent care does not overlap with the fields of medical oncology and/or orthopedic oncology); *Hudson v. Arias*, 106 Ohio App.3d 724, 730, 667 N.E.2d 50 (8th Dist.1995) ("Dr. Ransohoff, as a gastroenterologist, was competent to testify under *Alexander*, [but] he ultimately disqualified himself when he admitted that he had no knowledge as to what gynecologists do or should do when faced with an allegedly ambiguous barium enema study.").

{¶57} Saini's testimony did not go to all aspects of being a surgeon—it related only to the surgeon's reading of diagnostic images and whether those images indicated that surgery was necessary. He specifically rebutted Durrani's conclusions and justifications for the surgeries. The standard of care in reading diagnostic images is the same between surgeons and radiologists. The two may disagree, and a surgeon may order surgery despite a radiologist's conclusion that the images do not indicate that surgery is necessary. But the diagnostic images show what they show and a radiologist is equally, if not more, qualified to determine whether an image indicates a need for surgery. A radiologist is qualified to opine on a surgeon's standard of care in reviewing diagnostic images and ordering surgery based on those images.

{¶58} Appellants argue Saini should not have been permitted to testify regarding informed consent. Saini testified that a patient cannot give informed consent to a surgery that is not indicated unless the doctor explains that the surgery is not indicated.

{¶59} Saini described getting informed consent as "basic medicine 101." *Compare Hudson*, 106 Ohio App.3d at 729, 667 N.E.2d 50, citing *Alexander*, 56 Ohio St.2d at 163, 383 N.E.2d 564 (Leach, J., dissenting) and quoting *Alexander* at 160 ("In *Alexander*, it was clear that the podiatrist did not know the standard of care to be attributed to an orthopedic surgeon. However, the podiatrist did affirmatively testify that 'there was a common way all surgeons applied casts and that the principles used in applying the plaintiff's cast were the same as he had been taught.' The *Alexander* court then noted: 'The record, therefore, contains probative evidence that there exists a minimum standard of care common to all specialties with regard to the application of casts.' ").

{¶60} Saini is not a surgeon and primarily works remotely. But he testified that he completes some procedures on patients. He testified, "No matter what it is, there's a basic thing that you have to do, and that is, you have to explain to the patient what they're getting themselves into. You have to mention the risks, complications, rewards of doing the procedure." Getting informed consent is a practice that is standard across all types of doctors. Therefore, Saini was qualified to opine on the issue of informed consent.

{¶61} The trial court did not abuse its discretion in admitting Dr. Saini's testimony.

### Third Issue for Review

{¶62} In their third issue for review, appellants contend there was insufficient evidence for the jury to find that Adams suffered a catastrophic injury.

{¶63} The Ohio Revised Code caps the amount of noneconomic damages available for medical-malpractice claims at $350,000 for each plaintiff. R.C.

2323.43(A)(2). But it raises that cap to $500,000 where a plaintiff has suffered either of the following:

(a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system;

(b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life sustaining activities.

R.C. 2323.43(A)(3). The jury found that Adams suffered "permanent and substantial physical deformity."

{¶64} In 1975, R.C. 2307.43 was enacted to combat a perceived malpractice-insurance crisis. *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 11. The initial version had a $200,000 cap with no exceptions for those suffering severe injuries. *Id.* In *Morris v. Savoy*, 61 Ohio St.3d 684, 691, 576 N.E.2d 765 (1991), the court held that R.C. 2307.43 was unconstitutional. It concluded, "It is irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those *most severely injured* by medical malpractice." (Emphasis added.) *Id.* In 2003, the General Assembly passed R.C. 2323.43, which includes the higher cap for the most severe injuries.

{¶65} The General Assembly did not define the phrase "permanent and substantial physical deformity" in R.C. 2323.43. *Setters*, 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 33. However, under the plain and ordinary meaning of the word, a "deformity" is "a physical blemish or distortion" or "the state of being deformed," deformed meaning "unshapely in form" or "misshapen." *Id.*, quoting *Merriam-*

*Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/deformity, and https://www.merriam-webster.com/dictionary/deformed (accessed Dec. 30, 2021).

{¶66} A "permanent and substantial physical deformity" refers to "catastrophic" injuries, *Arbino* at ¶ 47, and must be "severe and objective." *Setters* at ¶ 35, quoting *Sheffer v. Novartis Pharmaceuticals Corp.*, S.D.Ohio No. 3:12-cv-238, 2014 LEXIS 184614, *5 (July 15, 2014), quoting *Weldon v. Presley*, N.D.Ohio No. 1:10 CV 1077, 2011 LEXIS 95248, *6 (Aug. 9, 2011). Misshapen or distorted conditions, restricted use of body parts, and significant scarring have been found to be "catastrophic injuries." *Setters* at ¶ 36.

{¶67} In *Setters,* this court held that there was sufficient evidence to submit the issue of a permanent and substantial physical deformity to the jury where the plaintiff's spinal anatomy changed as a result of the surgeries, she could only rotate her neck 20 degrees in either direction (normal rotation being 45-75 degrees), she could not laterally rotate or bend her neck, her neck was "misshapen," and she suffered an "abnormal cervical posture" so that her head fell to the side. *Setters* at ¶ 38.

{¶68} In the present case, in ruling on appellants' motion for judgment notwithstanding the verdict, the trial court found that the issue was properly before the jury primarily because of the "restructuring" of Adams's spine and the "deformity of stance and gait."

{¶69} Adams has almost completely lost the ability to rotate her head side to side. After the 2013 surgery, Adams developed a raspy voice and difficulty swallowing, which Bloomfield testified was a result of the surgery.

{¶70} The jury is in the best position to decide the nature and severity of the plaintiff's injuries. *Ohle v. DJO Inc.*, N.D.Ohio No. 1:09-CV-02794, 2012 LEXIS 140020, *11 (Sept. 28, 2012).

{¶71} The permanent physical changes made to Adams's spine and the restriction of movement in her neck provided sufficient evidence for the jury to find that Adams suffered a "permanent and substantial physical deformity." *See Setters,* 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 36 ("catastrophic injuries" include restricted use of body parts); *Setters* at ¶ 37, citing *Cawley v. Eastman Outdoors, Inc.,* N.D.Ohio No. 1:14-CV-00310, 2014 LEXIS 148194, * 20 (Oct. 17, 2014) (holding that the issue should go to the jury due to the scar on the plaintiff's hand and other external and *internal* deformities) (Emphasis added.); *Johnson v. Stachel*, 2020-Ohio-3015, 154 N.E.3d 577, ¶ 76 (5th Dist.) (holding that the permanent shortening of one leg and the surgical removal of a hip joint constituted "a structural change to [plaintiff's] skeletal system," and thus, a permanent and substantial physical deformity).

### Fourth Issue for Review

{¶72} The jury awarded Adams $116,533 in past medical expenses. Appellants argue Adams lacked standing to assert a claim for past medical expenses. They contend Adams was not the real party in interest for those expenses because she did not pay those bills—her insurer did. The trial court found that appellants had waived this defense.

{¶73} This issue was recently discussed by this court in *Setters,* 2020-Ohio-6859, 164 N.E.3d 1159. "The real-party-in-interest rule concerns proper party joinder." *Id.* at ¶ 56. "Civ.R. 19(A) instructs that a person 'shall be joined as a party in

23

the action if * * * he has an interest relating to the subject of the action as an assignor, assignee, subrogor, or subrogee.' " *Id.* The failure to join a necessary party is procedural and can be waived if it is not timely asserted. *Id.*

{¶74} A defense of failure to join a party may be asserted in an answer, by motion for judgment on the pleadings, or at the trial on the merits. Civ.R. 12(H). However, "merely raising the defense in an answer 'without further affirmative action to prosecute the raised defense results in a waiver of said defense.' " *Setters* at ¶ 57, quoting *Nationwide Mut. Fire Ins. Co. v. Logan*, 12th Dist. Butler No. CA2005-07-206, 2006-Ohio-2512, ¶ 24, quoting *Mihalic v. Figuero*, 8th Dist. Cuyahoga No. 53921, 1988 LEXIS 2026, *7 (May 26, 1988).

{¶75} Here, appellants raised the real-party-in-interest defense in their answer, but included no more than a conclusory statement, identical to the one in *Setters* at ¶ 58, and took no further action until after trial when they filed their postjudgment motions. Therefore, appellants "cannot avail themselves of the protection of the real-party-in-interest rule when they made no real effort to pursue the defense." *See id.* at ¶ 58.

### Fifth Issue for Review

{¶76} Adams settled with West Chester Hospital and UC Health prior to trial. Appellants argue they are entitled to a credit ("setoff") against the jury verdict in the amount of the settlement.

{¶77} "If a settling defendant is liable for any of the tort plaintiff's damages, then a nonsettling defendant is entitled to a setoff under R.C. 2307.28." *Setters* at ¶ 62. However, an intentional tortfeasor is not entitled to a setoff. *Eysoldt v. Proscan Imaging*, 1st Dist. Hamilton No. C-110138, 2011-Ohio-6740, ¶ 9. R.C. 2307.25

provides for contribution where "one or more persons are jointly and severally liable in tort for the same injury or loss to person or property * * *." However, the statute explicitly prohibits intentional tortfeasors from receiving contribution. R.C. 2307.25(A). This is characterized as a "narrow legislative exception to the general rule that among joint tortfeasors, the plaintiff is entitled to only one recovery." *Eysoldt* at ¶ 10.

{¶78} In *Jones v. VIP Dev. Co.*, 15 Ohio St.3d 90, 98, 472 N.E.2d 1046 (1984), *superseded by statute on other grounds*, *Houdek v. ThyssenKrupp Materials N.A., Inc.,* 134 Ohio St.3d 491, 2012-Ohio-5685, 983 N.E.2d 1253, the Ohio Supreme Court looked to R.C. 2307.25 when determining whether an intentional tortfeasor was entitled to a setoff under R.C. 2307.28. It held,

> It would be nonsensical to hold that while an intentional tortfeasor may not profit by means of contribution from a fellow wrongdoer, he may nevertheless secure a reduction in the judgment against him by the sum paid to plaintiff in exchange for a covenant not to sue. We refuse to presume that the legislature intended this incongruous result.

*Id.*; *accord Eysoldt* at ¶ 9.

{¶79} In *Eysoldt,* the nonsettling defendant was only found liable for intentional torts. Here, appellants were found liable for both intentional and unintentional torts. Nevertheless, as discussed below, the torts all contributed to the same injuries in a manner that makes it impractical to determine which tort caused which injury.

{¶80} We turn first to the jury interrogatories. Appellants argue the interrogatories show the jury awarded damages based in part on the 2010 surgery.

Regarding negligence, the jury found, "Mr. Durrani was negligent and breached the standard of care due to the fact that he performed a C1-C2 fusion surgery that was not medically indicated." Therefore, the jury found Durrani liable for negligence only for the 2013 surgery. Regarding the other claims, the interrogatories asked whether the jury found lack of informed consent "for either or both surgeries," that Durrani committed battery by performing "either or both surgeries," or Durrani fraudulently misrepresented the necessity of Adams's "surgeries."

**{¶81}** On the face of the interrogatories, it is unclear whether the jury found liability for lack of informed consent, battery, or fraudulent misrepresentation for the 2010 surgery, the 2013 surgery, or both. "If it is reasonably possible so to do, special findings of a jury must be harmonized with its general verdict." *Klever v. Reid Bros. Express,* 151 Ohio St. 467, 474, 86 N.E.2d 608 (1949). If we harmonize the interrogatories, the jury's finding that the 2013 surgery was not medically indicated, the evidence, the jury instructions and the theory of the case, we can infer that the jury did not find fraudulent misrepresentation, battery or lack of informed consent for the 2010 surgery. We can infer that all of the liability in this case stems from the 2013 surgery.

**{¶82}** The trial court instructed the jury:

Plaintiffs further assert that then-Dr. Durrani committed a battery upon Mrs. Adams by performing unnecessary surgeries without first getting informed consent -- the informed consent from Mrs. Adams. Finally, Mrs. Adams claims that then-Dr. Durrani engaged in a fraudulent misrepresentation regarding the surgeries in an effort to obtain Ms. Adams's consent for the surgeries.

* * *

Battery is simply the intentional unconsented contact with another. * * * Please note if you find Mrs. Adams gave informed consent for her surgeries, you must find there was no battery as to the surgery.

{¶83} The claims for battery, lack of informed consent, and fraudulent misrepresentation are all intertwined. The trial judge recognized the relatedness of the claims when he refused to present an interrogatory tendered by the defense that would have required the jury to apportion in percentages the fault attributed to each of the four causes of action. The court determined that was "an impossible task * * * in the nature of this particular case where everything is related: the negligence, lack of informed consent, battery, fraudulent misrepresentation are all related into one and they cannot be separated."

{¶84} The jury found that only the 2013 surgery was not medically indicated. Thus, there could be no informed consent for the 2013 surgery, as defense counsel acknowledged during the following exchange with the trial judge: Judge: "Do you agree if the surgery is not indicated, then there is no appropriate informed consent as a matter of law?" Defense counsel: "Yes, we would agree with that."

{¶85} Defense exhibit 64 was an informed-consent form for UC Health signed by Adams on November 4, 2010. Defense exhibit 471 was a consent form for West Chester Hospital signed by Adams on April 8, 2013. Adams's own expert, Dr. Bloomfield, testified that defense exhibits 64 and 471 were both valid informed-consent forms. But the trial court instructed the jury that the written consent forms were invalid if Adams proved that Durrani, in obtaining written consent, acted in bad faith or fraudulently misrepresented material facts.

{¶86} Wilkey and Bloomfield testified that, because of the misrepresentations made by Durrani, Adams did not give informed consent to either surgery. Likewise, Saini testified that a patient cannot give informed consent to a surgery where the surgery is not indicated unless the doctor informed the patient that the surgery is not indicated.

{¶87} In closing, Adams's counsel argued, "We believe that he fraudulently misrepresented the facts to induce Patricia to agree to the surgery. And we believe that you can't consent, no matter how great the form is and no matter how well the nurse explains it, you cannot consent to a medically unindicated or nonindicated surgery. You can't consent."

{¶88} Adams's theory was that Durrani fraudulently misrepresented the necessity of the surgeries in order to obtain her consent. The jury found Durrani liable for fraudulent misrepresentation, but it did *not* find that the 2010 surgery was not medically necessary. Therefore, we can infer that the jury did not find fraudulent misrepresentation regarding the 2010 surgery. The finding of fraudulent misrepresentation related only to the 2013 surgery. The same must be true of the battery and the lack-of-informed-consent claims.

{¶89} Because we cannot distinguish between the injuries caused by the battery and those caused by the unintentional torts, we hold that Durrani is not entitled to any setoff under R.C. 2307.28.

### Sixth Issue for Review

{¶90} Appellants argue the cumulative effect of the errors warrant judgment notwithstanding the verdict or a new trial. The cumulative-error doctrine is

inapplicable because appellants have failed to identify any error in the trial court's judgment. *See Setters*, 2020-Ohio-6859, 164 N.E.3d 1159, at ¶ 60.

{¶91} The first assignment of error is overruled.

### Second Assignment of Error

{¶92} In the second assignment of error, appellants contend that any claims based on Adams's 2010 surgery are barred by the four-year statute of repose in R.C. 2305.113(C). They argue the interrogatories show the jury awarded damages based in part on the 2010 surgery, and therefore, a new trial is necessary.

{¶93} Appellants raised the statute of repose as an affirmative defense in their answer, but did not raise the issue again until they made their motion for a directed verdict. The following exchange occurred during the oral argument on the motion for a directed verdict:

The Court: I haven't looked at this issue because nobody has presented me with this issue before right now.

* * *

Plaintiff's Counsel: I'm unaware of a [pretrial] ruling, one way or another. * * * [T]his is the first I'm hearing that this issue even remotely still exists in this case.

Defense Counsel: Yeah, but the issue – just because it wasn't raised and there's [not] a Motion to Dismiss or a Motion for Summary Judgment, procedurally we're still entitled to litigate the issue at trial.

* * *

The Court: Well, you can't sandbag me this way. It's not fair for me to have a Statute of Repose issue on this case after all the evidence is in and,

you know, I'm trying to rule on a * * * Motion for a Directed Verdict. I'm going to overrule that. * * * [I]t's my understanding that the judge was coordinating these cases and dealt with all of these issues, but if he didn't then --

Defense Counsel: This one seemed to slip through the cracks, Your Honor. I apologize.

{¶94} The trial court then permitted appellants to submit briefing on the issue, but they never took advantage of that opportunity.

{¶95} Appellants now claim that the statute of repose is jurisdictional and may be raised at any time. In *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 75, 701 N.E.2d 1002 (1998), the Ohio Supreme Court held,

[T]he expiration of a statute of limitations does not deprive a court of jurisdiction. To hold otherwise would elevate the defense of statute of limitations to the status of subject matter jurisdiction. This would mean that the defense of statute of limitations, as well as subject matter jurisdiction, could be asserted at any point in the proceedings. We are unwilling to make this leap.

{¶96} Like the expiration of a statute of limitations, the expiration of a statute of repose is also an affirmative defense. *See Groch v. Gen. Motors Corp.,* 117 Ohio St.3d 192, 2008-Ohio-546, 237, 883 N.E.2d 377, ¶ 251 (Pfeifer, J., concurring in part and dissenting in part). Thus, it follows that the expiration of a statute of repose also does not deprive a court of jurisdiction.

{¶97} Recently, the Ohio Supreme Court held that even if an affirmative defense is raised in an answer to the complaint, it is waived "when a litigant supplies

no argument 'regarding whether the relevant case law, applied to the facts of the case, justifies a decision in the litigants favor.' " *State ex rel. AWMS Water Solutions, L.L.C. v. Mertz,* 162 Ohio St.3d 400, 2020-Ohio-5482, 165 N.E.3d 1167, ¶ 53-55, quoting *Util. Serv. Partners, Inc. v. Pub. Util. Comm.,* 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 53 (Finding that although the state's nuisance defense was asserted in its answer, it waived the defense because it "did not ground its nuisance defense in principles of Ohio property and nuisance law.").

{¶98} The expiration of the statute of repose in R.C. 2305.113(C) is an affirmative defense and appellants were required raise the matter pretrial and apply relevant case law to the facts of the case. Because appellants failed to do so, they have waived the matter.

{¶99} Furthermore, while the record is not completely clear on the subject, it seems the interrogatories were requested by appellants or at a minimum agreed to by appellants. Defense counsel requested an interrogatory that was rejected by the court, and defense counsel told the court: "I've got to rearrange the Interrogatories because the consortium claim is in a spot that it's going to be confusing to the jury. That's the only thing we've got to change."

{¶100} "Where an interrogatory was submitted to the jury at defendant's request, it could not complain of error in the submission." *Klever,* 151 Ohio St. at 477, 86 N.E.2d 608, quoting *Stockgrowers' Bank of Wheatland v. Gray,* 24 Wyo. 18, 154 P. 593 (1916). When an interrogatory is ambiguous, it is construed against the proponent of the interrogatory. *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.,* 42 Ohio App.3d 6, 10, 536 N.E.2d 411 (9th Dist.1988), citing *Klever* at 474.

{¶101} Here, the answers to the interrogatories are ambiguous because the interrogatories did not distinguish between the 2010 and 2013 surgeries. Rather, the interrogatories referred to "either or both surgeries." If the defendants wished to argue that any claims based on the 2010 surgery were time barred, it was in their interest to request separate interrogatories for the 2010 and 2013 surgeries. Any error was invited by appellants. *See Klever* at 477.

{¶102} Finally, as discussed above, once the interrogatories are harmonized with each other, the jury instructions, the evidence, and the theory of the case, it is clear that all of the liability stems from the 2013 surgery. Thus, the second assignment of error is also overruled.

### *Conclusion*

{¶103} For the foregoing reasons, both assignments of error are overruled and the judgment of the trial court is affirmed.

Judgment affirmed.

**MYERS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.