# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DEBORAH WORLEY, as Executrix of the Estate of Fay Roseberry, | : | APPEAL NO. C-240386<br>TRIAL NO. A-1700331 |
| Plaintiff-Appellee, | : | |
| vs. | : | *JUDGMENT ENTRY* |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | |
| Defendants-Appellants, | : | |
| and | : | |
| WEST CHESTER HOSPITAL, LLC, et al., | : | |
| Defendants. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

The judgment of the trial court is reversed and the cause is remanded for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/27/2025 per order of the court.**

**By:**_____
 **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DEBORAH WORLEY, as Executrix of the Estate of Fay Roseberry, | : | APPEAL NO. C-240386<br>TRIAL NO. A-1700331 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N* |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | |
| Defendants-Appellants, | : | |
| and | : | |
| WEST CHESTER HOSPITAL, LLC, et al., | : | |
| Defendants. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: June 27, 2025

*Statman Harris, LLC*, and *Alan J. Statman*, for Plaintiff-Appellee,

*Taft Stettinius & Hollister LLP*, *Russel S. Sayre*, *Aaron M. Herzig*, *Philip D. Williamson* and *Annie M. McClellan*, for Defendants-Appellants.

**ZAYAS, Presiding Judge.**

**{¶1}** This appeal arises from a jury verdict in favor of plaintiff-appellee Debrah Worley, as Executrix of the Estate of Fay Rosebery ("plaintiff"), on her claims against defendants-appellants Abubaker Atiq Durrani, M.D., and Center for Advanced Spine Technologies, Inc., ("CAST") for negligence, lack of informed consent, and fraudulent misrepresentation.

**{¶2}** In two assignments of error, Durrani and CAST challenge the trial court's decision denying their post-judgment motions for judgment notwithstanding the verdict, a new trial, and a set off. For the reasons that follow, we sustain the first assignment of error in part and hold that the trial court abused its discretion in denying Durrani and CAST's motion for a new trial. Therefore, we reverse the judgment of the trial court and remand the cause for a new trial. We decline to address the remaining arguments and the second assignment of error as moot.

## I.    *Factual and Procedural History*

**{¶3}** After a referral from her primary care physician, 72-year-old Fay Rosebery sought treatment from Durrani for ongoing back pain. As a former truck driver, Ms. Rosebery had a history of lifting boxes and "things of that nature" that led to the start of her pain. Plaintiff—Ms. Rosebery's daughter who had lived with her for many years—accompanied Ms. Rosebery to her appointments with Durrani. According to plaintiff, Durrani told them at the first office visit that Ms. Rosebery had mild scoliosis and "went down the spine on the X-ray and showed a little curve at the bottom and a tiny bit at the top." Ms. Rosebery knew she had this condition for "many years" but was not receiving any treatment. Durrani recommended surgery and told them Ms. Rosebery "would come out of surgery feeling 100 percent better." An informed-consent form was signed, but Durrani told them he would fill in the

procedure on the form "later."

**{¶4}** Ultimately, Durrani performed two spine surgeries on Ms. Rosebery at West Chester Hospital in September and October 2010. However, according to plaintiff, Ms. Rosebery never got better after the surgeries. Plaintiff described the surgeries as "[a] waste of time," and "very painful" for her mother. She specifically denied that Ms. Rosebery ever got any relief from the surgeries, or "gained any improvement at all from Durrani." Instead, Ms. Rosebery had "continuous pain and suffering following the surgeries," and her ability to enjoy life "diminished rapidly."

**{¶5}** Ms. Rosebery initiated this medical-malpractice action against Durrani, CAST, West Chester Hospital, and UC Health in July 2014, asserting that the surgeries performed by Durrani were medically unnecessary for Ms. Rosebery's condition. After extensive pretrial proceedings, Ms. Rosebery's claims against Durrani and CAST—now prosecuted by plaintiff—proceeded to a nine-day jury trial in April 2019.[1]

**{¶6}** Plaintiff proceeded with her claims under the theory that Durrani deviated from the standard of care by lying about Ms. Rosebery's condition and need for surgery in his interpretations of Ms. Rosebery's medical imaging and performing unnecessary surgery that ultimately caused harm to Ms. Rosebery. Each side presented extensive expert testimony, as well as other evidence, in support of their respective positions. Of particular relevance to this appeal, plaintiff presented a video compilation to the jury of various depositional excerpts of Durrani, who was absent from trial.

**{¶7}** The jury ultimately returned a verdict in favor of plaintiff on all claims and awarded plaintiff compensatory damages in the amount of $899,431.45. The

---

[1] The claims against West Chester Hospital and UC Health were ultimately dismissed after a confidential settlement was reached.

compensatory-damages award consisted of economic and noneconomic damages, and the jury allocated the noneconomic damages as follows: negligence, 20 percent; lack of informed consent, 30 percent; and fraudulent misrepresentation, 50 percent. Beyond that, the jury awarded plaintiff punitive damages in the amount of $1 and found that plaintiff was entitled to recover attorney fees.

**{¶8}** Durrani and CAST filed two post-judgment motions relevant to this appeal: (1) a motion for "judgment notwithstanding the verdict, and/or (in the alternative) for a new trial, and/or (in the alternative) for a remittitur," and (2) a motion for "set-off or credit and related discovery."

**{¶9}** In the first motion, Durrani and CAST argued that admission of the various Durrani depositional excerpts, i.e., the "Durrani Collage," was prohibited by Evid.R. 404 or unduly prejudicial under Evid.R. 403. They asserted that "[n]one of the specific instances of conduct bore any conceivable relationship to Dr. Durrani's medical decision making with [Ms.] Rosebery. Instead, this evidence was merely an effort at character assassination and to vilify Dr. Durrani and inflame the jury." Durrani and CAST also specifically argued that testimony regarding Durrani's license revocations was "grossly improper," as it was irrelevant, unduly prejudicial, improper character evidence, or otherwise inadmissible. Durrani and CAST further argued that (1) the jury's finding of permanent injury was against the manifest weight of the evidence, (2) the cumulative effect of the "multiple errors" amounted to character assassination and unfair prejudice that warranted a new trial, and (3) they were entitled to a remittitur under R.C. 2323.43 reducing the noneconomic loss to $500,000. In the set-off motion, Durrani and CAST argued that a set-off was warranted based on "settlement with any other party," including West Chester Hospital and UC Health, under R.C. 2307.28 to prevent plaintiff from recovering twice

for the same injury.

**{¶10}** Ultimately, the trial court denied their request for judgment notwithstanding the verdict and/or a new trial and denied their request for a setoff but granted the remittitur under R.C. 2323.43(A)(3). The trial court later entered final judgment in favor of plaintiff, and Durrani and CAST now appeal.

**{¶11}** Under the first assignment of error, Durrani and CAST first argue for a new trial, asserting that the trial court erred in admitting the depositional excerpts of Durrani, i.e., the "Durrani Collage," and statements about Durrani's medical-license revocations and asserting that such errors were not harmless where this was a close case and the improper admissions "tipped the scales" in plaintiff's favor. Durrani and CAST additionally argue under the first assignment of error that plaintiff did not establish that Durrani caused Ms. Rosebery permanent injury that justified a higher cap on noneconomic damages. Under the second assignment of error, Durrani and CAST argue that Durrani is entitled to a setoff—i.e., a reduction in the jury's verdict—by the amount for which plaintiff settled with West Chester Hospital and UC Health.

## II. First Assignment of Error

### A. Standard of Review

**{¶12}** "Civ.R. 50 governs motions for judgment notwithstanding the verdict." *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 30 (1st Dist.), citing *Adams v. Durrani*, 2022-Ohio-60, ¶ 19 (1st Dist.). "We review the trial court's ruling on such a motion de novo and must construe the evidence in the light most favorable to the nonmoving party and only grant the motion if reasonable minds could come to but one conclusion which is in favor of the moving party." *Id.*, citing *Adams* at ¶ 19.

**{¶13}** "A motion for a new trial is governed by Civ.R. 59." *Id.* at ¶ 31, citing *Adams* at 20. "'A court may grant a motion for a new trial for, among other things, an

6

irregularity in the proceedings of the court, if the judgment is not sustained by the weight of the evidence, or any reason "for good cause shown."'" *Stephenson v. Durrani*, 2023-Ohio-2500, ¶ 15 (1st Dist.), quoting *Adams* at ¶ 20. "Upon a trial court's denial of a motion for a new trial, 'we "construe the evidence in a light most favorable to the trial court's action,"' while applying an abuse of discretion standard of review." *Id.* at ¶ 16, citing *Adams* at ¶ 20. "An abuse of discretion occurs when 'a court exercis[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority.'" *Id.* at ¶ 16, quoting *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

### B. The Durrani Collage

**{¶14}** Durrani and CAST first argue that the trial court erred in admitting the depositional excerpts of Durrani that have routinely been dubbed the "Durrani Collage" in Durrani-related cases.

**{¶15}** "A trial court has broad discretion regarding the admission of evidence, and, absent an abuse of discretion and proof of material prejudice, we will not reverse a trial court's ruling on an evidentiary issue." *Mann v. Durrani*, 2023-Ohio-2672, ¶ 17 (1st Dist.), citing *Hayes v. Durrani*, 2021-Ohio-725, ¶ 13 (1st Dist.).

**{¶16}** This court has routinely considered this issue and held that the trial court abused its discretion in admitting the Durrani Collage—as a whole—where it covered topics—spanning Durrani's Pakistani heritage, unrelated malpractice lawsuits, medical-license revocations, and resume inflation—that purported to attack Durrani's credibility and were unrelated to the actual case at hand. *See, e.g., Niehaus v. Durrani*, 2023-Ohio-4818, ¶ 38-39 (1st Dist.); *Stephenson*, 2023-Ohio-2500, at ¶ 41-43 (1st Dist.); *Mann*, 2023-Ohio-2672, at ¶ 16-20 (1st Dist.); *Stratman v. Durrani*, 2023-Ohio-3035, ¶ 18 (1st Dist.); *Greene v. Durrani*, 2023-Ohio-3069, ¶ 16 (1st Dist.).

{¶17} Durrani and CAST supplemented the record with a transcript of the collage version played at this trial, which they assert was the same version as that addressed by this court in *Niehaus*. Plaintiff has not disputed that this transcript is the correct transcript. The transcript confirms that the collage discussed topics similar to that which this court has held to be improper regarding Durrani, including that Durrani is not a United States citizen, that he grew up and went to school in Pakistan and other topics related to his heritage and upbringing in Pakistan, that his licenses were revoked, that he failed to disclose a criminal charge for assault in his applications for admission, that he was suspended from Medicare and Anthem as a medical provider, that he was previously sued for malpractice five times, and that he improperly inflated his resume in a number of specific ways and circumstances.

{¶18} Stare decisis dictates that we adhere to this court's previous holding regarding the Durrani Collage. *See, e.g., Liberty Mut. Ins. Co. v. Three-C Body Shop, Inc.*, 2020-Ohio-2694, ¶ 13 (10th Dist.) ("Under the legal doctrine of stare decisis, courts follow controlling precedent, thereby creating stability and predictability in our legal system."). Therefore, on the authority of the above-cited cases, we hold that the trial court similarly abused its discretion in admitting the Durrani Collage in this case.

### C. Statements Regarding Durrani's License Revocations

{¶19} Durrani and CAST next argue that, outside of the Durrani Collage, the trial court erred in allowing the jury to hear prejudicial statements throughout the trial about Dr. Durrani's license revocations.

{¶20} This court has also routinely considered this issue and held that the trial court abused its discretion in allowing frequent or extensive statements and questioning regarding Durrani's medical-license revocations throughout trial. *See, e.g., Stephenson*, 2023-Ohio-2500, at ¶ 38-40; *Hounchell v. Durrani*, 2023-Ohio-

2501, ¶ 35-49 (1st Dist.); *Stratman*, 2023-Ohio-3035, at ¶ 14-17 (1st Dist.); *Greene*, 2023-Ohio-3069, at ¶ 12-15 (1st Dist.).

**{¶21}** In this case, references to the license revocations occurred in voir dire, opening statement, during the playing of the Durrani Collage, twice on cross-examination, and in closing argument. Thus, like in the above-referenced cases, the license revocations were extensively referenced in this case.

**{¶22}** Consequently, in conformity with stare decisis, we hold that, on the authority of the above-cited cases, the trial court similarly abused its discretion in allowing the statements regarding Durrani's license revocations in this case.

### D. Harmless-Error Analysis

**{¶23}** Because the trial court abused its discretion in admitting the Durrani Collage and in allowing the license-revocation statements, this court must next consider whether the errors were harmless or were errors that warrant a new trial.

**{¶24}** "An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Niehaus*, 2023-Ohio-4818, at ¶ 40 (1st Dist.), citing *Setters v. Durrani*, 2020-Ohio-6859, ¶ 22 (1st Dist.), and *Mann*, 2023-Ohio-2672, at ¶ 21 (1st Dist.). "In determining whether substantial justice has been done, a reviewing court must weigh the prejudicial effect of the errors and determine whether the trier of fact would have reached the same conclusion had the errors not occurred." *Id.*, citing *Setters* at ¶ 22.

**{¶25}** This court has held that multiple improper evidentiary rulings, including admission of the Durrani Collage and evidence of Durrani's license revocations, resulted in cumulative prejudicial error that warranted a new trial where the errors were extensive and interrelated and shifted the jury's attention away from

the issue of medical malpractice and toward improper character issues concerning Durrani, and where the liability issues were "hotly contested in a close case." *Stephenson*, 2023-Ohio-2500, at ¶ 77-85 (1st Dist.); *accord Hounchell*, 2023-Ohio-2501, at ¶ 71-75 (1st Dist.) (holding that there was cumulative reversible error where the jury was likely to consider Durrani's credibility when rendering its verdict due to competing expert testimony and where the improper evidence "directly impacted the jury's assessment of credibility"); *Stratman*, 2023-Ohio-3035, at ¶ 21-28 (1st Dist.) (holding that there was cumulative reversible error where the case "was a close one" based on battle of the experts, evidence of improvement of the plaintiff's condition following surgery, and potential intervening causes); *Greene*, 2023-Ohio-3069, ¶ at 19-28 (1st Dist.) (holding that there was cumulative reversible error where the evidentiary record, jury interrogatories, and the jury's verdict rendered the case a close call).

**{¶26}** Here, Durrani and CAST assert that the Durrani Collage in this case was identical to the collage played in *Niehaus* and that, because this case was a close call with expert witness testimony presented from both sides and evidence from both sides indicating a successful surgery with no complications, a new trial is warranted as the improper evidence "tipped the scales" and turned Durrani "into a cartoon villain" that the jury intended to punish, as indicated by the punitive-damages award. In support of this assertion, Durrani and CAST claim that the evidence shows that Ms. Rosebery's pain was "no worse off" after surgery, her post-surgical injuries (a fall and a car accident) would have "much more to do with her post-surgery life" than the surgery itself, and Ms. Rosebery had "many other diseases" and smoked, which shows that the case was the "quintessential close call that could have gone either way." Further, they argue that counsel's emphasis on the improper topics from the collage and use of the

collage to depict Durrani as a liar renders the prejudicial effect "especially true."

**{¶27}** The issue of Durrani's credibility and the depiction of him as a liar began with voir dire in this case. One of the very first questions to the potential jurors by plaintiff's counsel was whether they would have an issue with the fact that plaintiff was going to call Durrani "a liar" for putting Ms. Rosebery through surgeries that were not medically indicated and should never have been recommended. Counsel told the jury that they intended to prove that Durrani was not an "honest doctor" and that was why it was important to know if any members of the jury put doctors "up on a pedestal." Counsel then proceeded to question the potential jurors about any prior spine surgeries and whether any of them had experiences—good or bad—that would impact their ability to be fair and impartial on the issues in the case.

**{¶28}** Throughout this questioning, counsel made certain statements to reference back to the credibility issue. ("Any issue with the fact that we're going to point out that a physician didn't tell the truth?"); ("Anything about the fact that we're going to put on a case about someone that misrepresented–a physician that misrepresented the radiology and the need for other tests in order to induce our client to have surgery?"); ("[W]as there any time during that process of that particular surgery from start to finish that you doubted the truthfulness of [that doctor]?"); ("Do you believe, though, that there's an occasional bad apple in the bunch that even though doctors are taught to do no harm that there could be a doctor that isn't completely truthful?"); ("Can we all agree that that's an overriding factor, that everybody wants to know they're being told the truth by a physician? Well, in this case, as I earlier indicated, we're not just saying that Dr. Durrani made a mistake, we're saying that he intentionally misled [Ms. Rosebery] into two surgeries that were not indicated.").

**{¶29}** Plaintiff's counsel also brought up the fact that Durrani was no longer

licensed in Ohio or Kentucky. He said,

> You're also going to be told that Dr. Durrani no longer has a medical license in Ohio or Kentucky. And you'll have to decide for yourselves what that means to you. He did not lose it based upon this case, but he no longer has a medical license. Okay? Anybody have an issue with no medical license, not here, but we're going to make decisions about what he did or didn't do? Again, I'm getting paranoid.
>
> You'll let the evidence take you where it takes you, right?

In response, a juror asked, "He had one then?" Counsel replied, "He had one then, yes."

**{¶30}** Defense counsel did attempt to mitigate the impact of these issues during voir dire. First, defense counsel questioned a potential juror as to how he felt hearing that Durrani is no longer licensed and informed the juror that the licensing issues "had nothing to do with this case at all." Therefore, he confirmed with the juror that he or she could keep whatever "negative feeling" they were feeling on the issue "out of the box" of evidence to decide the case. Further, defense counsel questioned another potential juror about the depiction of Durrani as a liar and asked what he or she thought when plaintiff's counsel said they were going to prove as much. When the juror responded that, to him or her, it went toward intent to deceive, defense counsel clarified and distinguished between lying on imaging studies and Durrani giving his own interpretation of the imaging, "with which perhaps the plaintiff's experts disagree." In other words, defense counsel distinguished between an opinion based on "something made up" or something based on "factual information for the patient." Defense counsel then confirmed that the juror was okay with evaluating the information to determine whether Durrani intentionally made up pathology or

12

whether the patient "truly had pathology that could have been interpreted different ways by different spine surgeons or neurosurgeons." The juror responded, "That's probably going to be a central part of the case." Defense counsel also questioned another potential juror on these issues and reaffirmed that the license revocations were outside the box of evidence to be considered in the case and that whether Durrani was lying is an issue to be decided based on the evidence presented in the case.

{¶31} Nevertheless, plaintiff's counsel told a potential juror in response that the license revocations were "inside the box" and suggested that jurors should wait to hear from the judge about what the law is before making any decisions as "it's not just what [defense counsel] says goes in the box." Further, plaintiff's counsel discussed the lying issue and confirmed with a potential juror that he or she agreed that when a doctor tells you that imaging depicts something when it actually doesn't, it is not a difference of opinion; rather, it is a misrepresentation of the imaging. He then said, "So in looking at the diagnostic techniques that doctors use and comparing it to what they say, it's possible to mete out whether something is just a difference of opinion or an outright lie, right?"

{¶32} Ultimately, while there was some back and forth on these issues during voir dire, a potential juror's comments toward the end of voir dire indicate that the jury likely understood that there were two sides being presented, with each side having a different opinion on what goes "in the box." ("[B]oth of you have done a good job of trying to say we're going to try and put things in the box and we hope you keep an open mind and consider it. That seems to be a good course to follow."); ("[W]e've gotten two sides of this, first from [plaintiff's counsel] and then from [defense counsel]. As long as the law is settled and the judge gives us a set of instructions, then it doesn't matter."); ("I know when you both started talking, you're giving me two sides of the

story. As long as everybody ultimately agrees that it does not matter what his medical-license situation was, then it doesn't matter to me.").

{¶33} So, by the end of voir dire, it does not appear that the jury was predisposed to determine the case based on any improper consideration of Durrani's character. However, credibility was certainly established as a key issue in the case.

{¶34} At the start of opening statement, plaintiff's counsel identified the issues as showing that Durrani deviated from the standard of care and lied to Ms. Rosebery about her condition. Counsel pointed out Durrani's license revocations and paired this information with Durrani's refusal to attend trial. However, the remainder of the opening statement focused on the evidence and what it would show. There was no other mention of the license revocations, depictions of Durrani being a liar (outside of the suggestion that the surgeries were not medically indicated), or any other improper character comments.

{¶35} The trial progressed with the testimony from plaintiff and expert testimony from each side. The central issue in the case was whether Durrani misrepresented the findings from the imaging for Ms. Rosebery that allegedly warranted the surgeries performed. Notably, the presentation of the expert testimony fell right in line with how the case was represented to the jury during voir dire. Plaintiff's experts supported the idea that Durrani intentionally misrepresented his findings. On the other hand, defense experts supported the idea that Durrani's interpretation of the imaging was a reasonable interpretation. In other words, the issue came down to whether Ms. Rosebery's imaging could have been reasonably interpreted in a manner consistent with Durrani's findings or whether nothing in the imaging supported such representations.

{¶36} The Durrani Collage was played around the middle point of this

evidence. Further, Durrani and CAST point to two instances where the license revocations were mentioned during trial, outside of what was mentioned in the Durrani Collage. In the first instance, plaintiff's counsel asked a defense expert on cross-examination, "Again, in terms of background, you're aware that Dr. Durrani's medical license was revoked by both Ohio and Kentucky, is that right?" In the second instance, plaintiff's counsel asked another defense expert on cross-examination, "You also know that his medical license in Ohio and Kentucky was revoked; is that right?"

{¶37} Plaintiff's counsel then presented a closing argument in which he extensively referenced the topics from the Durrani Collage. Counsel began by pointing out plaintiff's burden in the case and discussing credibility. He then said,

> [Defense expert] came in here and he contradicted everybody, including the Defense's own witnesses. And I would dare say that he could have just gotten up here and said, You know what, Dr. Durrani is awesome. He's awesome. Because that's pretty much all he said, he's awesome.
>
> Well, if Dr. Durrani is so certain and so awesome, where is he? We have an empty chair. But their experts will tell you, I don't know where he is, I don't know what he's doing, I didn't talk to him, I don't need to talk to him.
>
> Well, I think it would be nice if you had heard directly from Dr. Durrani on this case.
>
> So what did I have to do on this issue of credibility? So right now I have this 'X' moves over here (indicating) and this one (indicating) is out in some other galaxy, not even a different universe.
>
> What I had to do is I had to put together a video of Dr. Durrani

to bring him in here and give you some idea of who we're talking about and what [Ms. Rosebery] and [plaintiff] dealt with and who he is.

It's their client (indicating), but I had to introduce you to Dr. Durrani.

And what did we learn about Dr. Durrani? He's a liar. The most important aspect of his medical life as an orthopedic spine surgeon is maintaining a medical license. In order to do that, you have to fill out an application. It's multiple pages. It is signed under oath and everything you are representing to the Ohio and Kentucky Medical Board is the truth, but he couldn't do that.

You got to observe his manners, his body language. You got to observe his evasive nature of how he dealt with every question. And what you got to see is the fact that Dr. Durrani denied knowing that he had been sued more than half a dozen times for medical malpractice back when he did his licensure. I didn't know anything about any lawsuits pending.

And he didn't know, that at the time he filled it out, that he had a criminal case pending in Mason Municipal Court up the road. He didn't know that he had been sued by Dinsmore & Shohl for failing to pay attorneys' fees to them. He didn't know any of the things.

And when you point it out to him that it wasn't just whether there was a finding against him, that these were things that had to be pending at the time, he said, I don't know, I don't remember, somebody else takes care of that stuff for me, but you know, he has to do it every two years. So it's not like I forgot something 10 years ago. Every two years

16

he had a chance to fix that. He chose not to.

And why does somebody lie on his application? For the same reason they lie on a resume. We told them all of the wonderful things that his website said about him: Best spine surgeon in Pakistan. Where did it come from, Dr. Durrani? I don't know. I don't know how that stuff gets there.

You asked him about his resume. I don't remember if I did that. I didn't put dates down. I was once a member, maybe I'm not anymore. We had to bring that to you.

It's just a lesson in judging credibility from my point of view. You may see it differently, but the way that I see it is if that's what he's all about, he is willing to lie on the most important thing in his professional life, maintaining his medical license, the most important thing. Without it, he loses his practice, he loses everything he worked for through his education, and he loses his identity.

He couldn't even spend the time to correct what was wrong if it was a mistake, and I say it was a flatout [sic] lie because he was served with every one of those lawsuits. He knew about them. He knew exactly what was going on.

So on the credibility front, Durrani ends upon our side (indicating) because I think he proves exactly what [plaintiff's expert] said. [Plaintiff's expert] said there was a lot of lying going on in terms of Dr. Durrani's reputation for truthfulness and honesty in the community back in 2010 to 2012. [Plaintiff's expert] said there was a lot of dishonesty.

**{¶38}** Later in his closing, plaintiff's counsel continued,

[Plaintiff's expert] tells you exactly what that spine looked like. You have all of the other reading radiologists, and you'll see their names on their reports. And you can look at those reports and you can decide whether they are consistent and do they agree with what Dr. Durrani was saying in that series of letters. You can just look at it, and you can use your common sense to make that comparison.

You don't need me and you don't need an expert to say that if someone says mild but Dr. Durrani says, severe, who's lying, a treater or someone that is going to do two major surgeries and make a bunch of money?

**{¶39}** Counsel pointed out that plaintiff's experts "all agree with the treaters." Counsel later said, "So as you look at this case, I think there's a clear path to a verdict, whether that verdict is for the empty chair or whether that verdict is on behalf of the administration of [Ms. Rosebery]'s estate." Counsel concluded the burden portion of his argument by stating,

So I submit to you that when you look at all of this and you consider the credibility of the witnesses, you consider the fact that I was the one that had to bring Dr. Durrani in here through a videotape to introduce him to you, that he has chosen—not chosen—has refused to come to the trial and that events led to him losing his license.

He didn't lose his license because of this case but events led to him losing his license, that you can only come to one conclusion, that is that we met our burden of a preponderance of the evidence and the verdict should be for the Plaintiff.

**{¶40}** Further, counsel concluded his rebuttal argument by stating,

> And start thinking about that video that you watched of Dr. Durrani and think about him telling a hundred percent, I'm a God – or [plaintiff's expert], I'm the king of surgery, and you decide whether those are sideshows or that all feeds into the fact that this poor woman was deceived, fraudulently induced and negligently treated which directly and proximately caused injuries to her. I think the only verdict that you can conclude is for the Plaintiff.

**{¶41}** Based on the foregoing, this is not a case in which improper evidence was just limitedly referenced during trial. *Compare, e.g., Potts v. Durrani*, 2023-Ohio-4195, ¶ 20, 42 (1st Dist.), and *Bender v. Durrani*, 2024-Ohio-1258, ¶ 120 (1st Dist.) (holding that improper evidentiary rulings constituted harmless error where the improper evidence was only limitedly referenced during trial and the record did not indicate that the defendants were deprived of a fair trial or that the trier of fact may have reached a different result had the errors not occurred).

**{¶42}** Rather, plaintiff's counsel first used voir dire to set the tone for trial and identify Durrani's credibility as a key issue in the case. Then, plaintiff presented the Durrani Collage midtrial, injecting various topics into the minds of the jury regarding Durrani's character that would influence the issue of Durrani's credibility in the midst of the jury choosing which side to believe. Finally, plaintiff's counsel used closing argument to tie all the pieces together and exemplify to the jury that plaintiff's side is correct as Durrani—as a person—is a liar.

**{¶43}** The jury then found in plaintiff's favor on all claims based on misrepresentations, attributing 50 percent of the damages specifically to the fraudulent-misrepresentation claim and explicitly awarding punitive damages and

attorney fees on the basis of misrepresentation.

**{¶44}** In such a situation, "[t]he jury's assessment of Durrani's credibility was assuredly impacted by the admission of the evidence in the collage, and we cannot say that the outcome of the trial would have been the same but for its admission." *Neihaus*, 2023-Ohio-4818, at ¶ 42 (1st Dist.), citing *Mann*, 2023-Ohio-2672, at ¶ 25 (1st Dist.).

**{¶45}** Further, the improper admission of the collage and the references to Durrani's license revocations shifted the jury's attention away from the issue at hand and towards improper character issues concerning Durrani. The jury verdict was not unanimous, indicating that this was not a one-sided case. Rather, the case centered on Durrani's credibility and the opinions of the experts on each side as to whether Durrani's representations were fabricated or reasonable. In such a situation, this court cannot say that the jury would have reached the same conclusion had the errors—which go straight to the heart of Durrani's credibility—not occurred.

**{¶46}** Based on the foregoing, we hold that the trial court abused its discretion in denying Durrani and CAST's motion for a new trial based on cumulative error regarding the improper admission of the Durrani Collage and references to Durrani's license revocations. Accordingly, we sustain the first assignment of error in part as to the trial court's failure to grant a new trial.

### E. Catastrophic Injury

**{¶47}** Durrani and CAST additionally argue that plaintiff did not establish that Durrani caused Ms. Rosebery permanent injury justifying a higher cap on noneconomic damages. However, because this court is sustaining the first assignment of error in part and reversing for a new trial, this part of the first assignment of error is moot and need not be addressed. *See, e.g., Greene*, 2023-Ohio-3069, at ¶ 30-31 (1st

20

Dist.).

### III.    Second Assignment of Error

**{¶48}** In the second assignment of error, Durrani and CAST argue that Durrani is entitled to a setoff—i.e., a reduction in the jury's verdict—by the amount for which plaintiff settled with West Chester Hospital and UC Health.   However, because this court is sustaining the first assignment of error in part and reversing for a new trial, the second assignment of error is moot and need not be addressed.  *See, e.g., Greene* at ¶ 30-31.

### IV.    Conclusion

**{¶49}** For the foregoing reasons, we sustain the first assignment of error in part as to the trial court's denial of the motion for a new trial, reverse the judgment of the trial court, and remand the cause for a  new trial.

**{¶50}** Beyond that, we decline to address the remaining arguments made moot by our resolution of the first part of the first assignment of error.

Judgment reversed and cause remanded.

**CROUSE** and **NESTOR, JJ.,** concur.